UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE

VICKIE WRIGHT, individually and as next
friend and wife of David Wright, Deceased,

    Plaintiff,

v.                            Case No. 3:24-cv-00220-TAV-DCP

SEVIER COUNTY, TENNESSEE, BART
TYNER, MARK HUNTER, CITY OF
SEVIERVILLE, TENNESSEE, JACOB REECE,
JORDAN PAUL, NESTOR VEREZ, and
JACOB RADEMACHER,

    Defendants.

**MEMORANDUM BRIEF IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT ON BEHALF OF MARK HUNTER**

## I.    INTRODUCTION

Vickie Wright, individually and as next friend and wife of David Wright, deceased, has filed this action under federal law pursuant to 42 U.S.C. § 1983 ("Section 1983") asserting that the constitutional rights of herself, individually, and her deceased husband, were violated under the Fourth and Fourteenth Amendments. Because certain claims are only asserted by Vickie Wright ("Mrs. Wright") in her individual capacity, and other claims are only asserted by Mrs. Wright on behalf of her deceased husband, David Wright ("Mr. Wright"), this Brief refers to "plaintiffs." The plaintiffs have sued Sevier County, Tennessee ("Sevier County"), the City of Sevierville, Tennessee ("Sevierville"), officers employed by Sevierville at the Sevierville Police Department ("SPD"), and two Sevier County officers who work at the Sevier County Sheriff's Office ("SCSO"), Sergeant Bart Tyner ("Sgt. Tyner") and Deputy Sheriff Mark Hunter ("Deputy

1

Hunter"). In addition to the federal law claims, the plaintiffs have also sued the individual defendants under state law for assault and battery, and intentional infliction of emotional distress.[1]

The defendant, Deputy Hunter, in his individual capacity, has filed for summary judgment based upon qualified immunity asserting that he did not violate the constitutional rights of Mrs. Wright or Mr. Wright, or in the alternative, that there was no clearly established law that would have placed every reasonable officer in his position on notice that his conduct was violative of the constitutional rights of Mrs. Wright and Mr. Wright.

## II. FACTUAL BACKGROUND

1. At the time of the events in question, Mark Hunter was employed as a deputy sheriff with the SCSO. *Declaration of Mark Hunter, ¶ 2.*

2. On May 12, 2023, Deputy Hunter was working for the SCSO. Around 8:00 p.m., he was notified that SPD officers needed assistance from County officers to go to the residence of a driver who had fled from the officers. *Hunter Decl., ¶ 4.*

3. Deputy Hunter went to New School to meet up with the other officers. It is located near the residence. When Deputy Hunter arrived at the school, SPD Officer Nestor Verez arrived at about the same time. Upon arrival, Officer Verez and Deputy Hunter noticed that the location where the officers were meeting at the school was in view of the residence at issue, and they advised the other officers. Soon thereafter, all officers left the school and proceeded to the residence located at 2739 Holly Drive. *Hunter Decl., ¶ 5.*

---

[1] In a related state court action that is currently pending, the plaintiffs have sued Sevier County and Sevierville for negligence under the Tennessee Governmental Tort Liability Act. *See Vickie Wright, Individually and as next friend and wife of David Wright, deceased v. Sevier County, Tennessee and City of Sevierville, Tennessee*, Sevier County Circuit Court No. 24-CV-302-II.

4. Upon arrival at the residence, Deputy Hunter knew that Sgt. Tyner, his supervisor, was going to proceed to the front door for purposes of doing a "knock and talk." Deputy Hunter assumed a SPD officer would accompany him. Deputy Hunter went to the rear of the residence with three SPD officers, Jacob Rademacher, Nestor Verez, and Jordan Paul, who is a K9 officer. He had his K9, Hank, with him. *Hunter Decl., ¶ 6.*

5. Deputy Hunter was wearing a body camera and it was recording. A true and accurate copy of the recording is attached as Exhibit A to his Declaration. *Hunter Decl., ¶ 7.*

6. A review of Exhibit A shows the following interactions at the labeled time marks on the recording:

a. 20:15:53     At this point, Deputy Hunter is at the back of the house at the side. He can see the back deck, which is up a set of stairs. Deputy Hunter sees a white male and instructs him to come down the stairs. Instead, he returns inside.

b. 20:15:56     Deputy Hunter moves to the bottom of the steps to the back deck.

c. 20:16:01     Deputy Hunter ascends the steps up to the first landing. There are further steps to reach the back deck (and the back door that the man just retreated into).

d. 20:16:07     Two SPD officers ascend the stairs and pass Deputy Hunter, who holds his position on the first landing.

e. 20:16:13     SPD officers are not sure it's Daryl Higdon, but go to the back door and instruct him to open the door.

f. 20:16:22     Deputy Hunter provides a description of the man he saw: white male, goatee, black shirt.

g. 20:16:55     Deputy Hunter asks if they have contact upfront.

h. 20:17:02     SPD officers at the back door yell for the man to come to the door with his hands in the air or they are coming in.

i. 20:17:09     Deputy Hunter hears yelling coming from upfront and he begins running in that direction.

3

j. 20:17:14   Deputy Hunter continues to hear yelling from upfront and he continues running in that direction.

k. 20:17:17   By this point, Deputy Hunter has reached the front side of the house. He can see Sgt. Tyner on the front porch and he can hear him yelling: "Put the gun down!"

l. 20:17:20   At this point, Deputy Hunter is approaching the front porch. He stops running. He can see Sgt. Tyner and he is repeatedly yelling: "Put the gun down. Put the gun down now." His weapon is drawn. SPD Officer Reece and his K9 are just behind him on the steps to the front porch. Office Reece has his weapon drawn as well.

m. 20:17:26   Deputy Hunter continued to approach and Sgt. Tyner continues to repeat his orders to: "Put the gun down now." Officer Reece has now descended the steps with his K9.

n. 20:17:29   At this point, Deputy Hunter heard the charging handle of an AR 15. Shots are fired. Sgt. Tyner shoots first, and gives another command to: "Put the gun down."

o. 20:17:31   Someone inside the residence begins firing. Sgt. Tyner and Officer Reece move for cover.

p. 20:17:35   Deputy Hunter moves towards the side of the house for cover, and stops for an instant to see that Sgt. Tyner is now under the wooden front porch. Deputy Hunter does not know his condition.

q. 20:17:38   Deputy Hunter moves further to the side of the house for more cover. He radios "shots fired" three times.

r. 20:17:39   At this point, Deputy Hunter began running for a tree to take cover, but Officer Paul and his K9 Hank reached the tree first, so Deputy Hunter ran to his cruiser for cover.

s. 20:17:45   Deputy Hunter reaches the back of his cruiser for cover. One of the SPD officers is beside him.

t. 20:17:52   A second SPD officer arrives to take cover behind Deputy Hunter's vehicle.

u. 20:17:53   At this point, repeated shots are coming from the house, but it is unclear exactly where they are coming from.

4

v. 20:18:09  One of the SPD officers with Deputy Hunter says: "I can't see him."

w. 20:18:10  Deputy Hunter radios to dispatch that "we need more units!"

x. 20:18:16  The SPD officer says again: "I can't see him. Give me a second."

y. 20:18:40  After several seconds of repeated firing from the residence, Deputy Hunter says: "God … I don't know where he's coming from."

z. 20:18:47  Deputy Hunter fired three rounds with his pistol. Deputy Hunter was aiming at a shooter at the back of the residence.

aa. 20:18:50  Several more rounds are fired from the residence. The initial shots were fired out the front door. At other points, the shots were coming from the back deck. For that reason, Deputy Hunter is concerned that there are two shooters.

bb. 20:19:06  SPD officers are now yelling for one of the officers to get a rifle. Deputy Hunter is still positioned behind his cruiser. His rifle is in his cruiser, but Deputy Hunter is concerned that if he goes to the front passenger door to retrieve his rifle that he will be shot.

cc. 20:19:11  Deputy Hunter decides to make the attempt to retrieve his rifle. He tells Sgt. Rachemacher to "cover me."

dd. 20:19:14  Deputy Hunter opens the front passenger door of his cruiser. It takes him until 20:19:21 to retrieve his rifle and return to his position behind his vehicle. Deputy Hunter was in an exposed position during this period of time.

ee. 20:19:25  Deputy Hunter pulled back on the charging handle to move a rifle cartridge into the firing chamber so that he can begin firing. His rifle had a red dot optic, but it did not have a scope with magnification.

ff. 20:19:36  For several seconds prior to this, Deputy Hunter and other officers continue to be under fire. As Deputy Hunter maneuvers with his rifle to the passenger side of his cruiser, he says: "Where's he at?"

gg. 20:19:41  Deputy Hunter fires rounds with his rifle towards the back deck of the residence.

hh. 20:19:57  Deputy Hunter runs to a SPD cruiser that is parked behind his cruiser in order to have a better angle towards the back of the house. K9 Hank has gotten free from SPD Officer Paul, and Officer Paul yells: "He's hit!"

5

Officer Paul is talking about the fact that K9 Hank has been shot.

ii. 20:20:04    Deputy Hunter fires four rounds from his rifle towards the back deck of the residence.

jj. 20:20:09    SPD Officer Paul is repeatedly saying "he's hit" – meaning K9 Hank – and there is a discussion about the location of the "med kit" (medical kit).

kk. 20:20:30    Deputy Hunter opens the rear hatch of his cruiser to retrieve his med kit.

ll. 20:20:33    A SPD officer says he needs cover to get his rifle out. Deputy Hunter responds: "We don't know where he [meaning the shooter] is at."

mm. 20:21:01    Deputy Hunter is moving from one side of his cruiser to the other trying to get vantage points at the rear and front of the house because he doesn't know where the shooter is. Deputy Hunter says to SPD Sgt. Rademacher: "Where's he at?" Deputy Hunter is referring to the shooter.

nn. 20:21:37    SPD Sgt. Rademacher says: "I seen him [meaning the shooter] peek through the front door, so watch that." Deputy Hunter trains his rifle on the front door.

oo. 20:21:45    Deputy Hunter fires one round towards a person's head that he saw at the front door. At that moment Deputy Hunter did not know that he hit anyone. Deputy Hunter fired because he believed the person at the front door had a gun, and that their lives were in imminent danger, especially Sgt. Tyner whom Deputy Hunter knew was injured, possibly shot, just around the corner from the front porch, and unable to retreat to cover.

pp. 20:22:03    Deputy Hunter radios Sgt. Tyner and provides him the following information: "I'm behind my car. There is one at the front door with a gun where you are; if you can take a step back to the right, behind the house for me." At this point in time, Deputy Hunter is concerned that there are two shooters. Deputy Hunter is also concerned that if the shooter, that Deputy Hunter perceived at the front door, should come down the front porch steps that Deputy Hunter will not be able to fire his rifle for fear of hitting Sgt. Tyner. Therefore, Deputy Hunter is asking Sgt. Tyner that if he is able, to move further behind the house so that he does not accidentally shoot him.

qq. 20:22:13    SPD officer says to Deputy Hunter: "Do you see where he's at man?" Deputy Hunter responds: "There's one person … there's one at the front door." Again, Deputy Hunter believes there are two shooters.

rr. 20:22:22    Deputy Hunter asks the SPD officers around him: "Does anyone have the

6

back door?" By this, Deputy Hunter is asking whether any officer is watching the back door because Deputy Hunter is watching the front door and he is concerned that there may be two shooters.

ss. 20:23:43   Deputy Hunter radios to Sgt. Tyner that K9 is shot and needs to evac from here."

tt. 20:24:13   Deputy Hunter still has his rifle trained on the front door, and Deputy Hunter says: "Front door contact!"

uu. 20:24:15   Deputy Hunter sees a female at the front door. Deputy Hunter gives her the following command: "Show us your hands!"

vv. 20:24:18   Deputy Hunter continues giving her commands to show her hands and to come down the stairs. Deputy Hunter then instructs her to walk in the middle of the street towards him.

ww. 20:25:07   As the lady (now known to be Mrs. Wright) reaches Deputy Hunter, he asks her where is the shooter, and she says on the back porch.

xx. 20:25:07   Mrs. Wright has a cut on her right cheek that can be seen here.

yy. 20:25:12   Deputy Hunter asks Mrs. Wright if the shooter has been shot, and Mrs. Wright tells him that he has been.

zz. 20:25:15   Mrs. Wright says that someone killed her husband.

aaa. 20:25:22   A SPD officer asks her: "Who was the one shooting at us?" And she responds: "My brother."

bbb. 20:25:25   Mrs. Wright asks why she is being cuffed and Deputy Hunter tells her: "Because someone's shooting at us." In other words, she was being handcuffed and placed in a cruiser for her safety and for officer safety. Officers are trained to handcuff persons in dangerous and fluid situations for not only their protection, but for the citizen's protection as well.

ccc. 20:26:20   Mrs. Wright informs Deputy Hunter that her brother has been shot. Deputy Hunter radios that her brother has been shot as well. Deputy Hunter has already radioed that she is reporting that her husband was "down and 62" – meaning deceased.

ddd. 20:26:45   The cut to Mrs. Wright's right cheek is visible at this point. She informs that her brother has been shot and is bleeding from the stomach area.

eee. 20:26:55  Deputy Hunter places Mrs. Wright in a SPD cruiser.

fff. 20:27:57  The man now known as Daryl Higdon comes out onto the front porch to surrender.

*Hunter Decl., ¶ 8 from sub-paragraph "a." to sub-paragraph "fff."*

7.  With respect to the length of time that Mrs. Wright was in the SPD cruiser, even after Mr. Hidgon surrendered, the scene was still not secure. Mrs. Wright had reported that her husband was inside deceased, and that her brother, Mr. Higdon, was the shooter. But the SWAT team had been dispatched and the decision was made by officers above Deputy Hunter's rank to have the SWAT team clear the house to make sure that there was no further threat. Mrs. Wright did not appear to Deputy Hunter to have any medical issues that required immediate medical attention. Her brother's situation was different. He had been shot, and as soon as he could be evacuated from the scene, he was. Deputy Hunter has been informed that a helicopter transported him to the University of Tennessee Medical Center; and that he survived. Hunter *Decl., ¶ 9.*

8.  With respect to Deputy Hunter's decision to fire his weapon at a person at the front door, Deputy Hunter knew that there had been heavy gunfire from both the front door and the back door. Deputy Hunter knew Sgt. Tyner was possibly shot, and that due to his injury, he was in an exposed position. Deputy Hunter perceived a weapon with the person at the front door, and he fired one shot. Deputy Hunter did that to protect the lives of all of the officers, but especially Sgt. Tyner. *Hunter Decl., ¶ 10.*

9.  From Deputy Hunter's body camera, one cannot see what he saw at the front door when he fired the shot that apparently struck Mr. Wright. But here is a screen shot from a Ring camera across the street. While the screen shot is from a different angle as compared with Deputy Hunter's position, it shows something dark at the front door. From Deputy Hunter's position, which was

8

further away, he perceived it to be a gun. As quoted earlier, immediately after Deputy Hunter fired the single shot at a person at the front door, he radioed Sgt. Tyner that a person at the front door had a gun. In other words, Deputy Hunter made this statement before he knew that anyone at the front door had been shot or killed:



*Hunter Decl., ¶ 11.*

10. During the time frame that Deputy Hunter was firing his rifle at someone at the back porch or front door, he does not know his exact distance. His best estimate is that he was 50-60 yards from the back porch and that the front door was an additional 5-10 yards further from his location. Deputy Hunter's rifle had a red dot optic on it, but it did not have a scope with magnification. *Hunter Decl., ¶ 12.*

9

### III. APPLICABLE LAW

A. <u>Summary judgment standard</u>

Federal Rule of Civil Procedure 56(a) provides in pertinent part: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." With respect to the facts, the normal rule applies that all facts, and reasonable inferences therefrom, are drawn in the light most favorable to the nonmovant. *See City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001). However, the "mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). Additionally, since there are video recordings showing the events at issue, plaintiff cannot introduce testimony or other evidence to try to create a disputed material fact if that evidence would "blatantly contradict[ing] a video recording." *Scott v. Harris*, 550 U.S. 372 380-81 (2007). With respect to the law, it is the nonmovant (responding to a qualified immunity motion) who has the burden of proving both the violation of a constitutional right, and that the right was "clearly established." *See McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016).

B. <u>Qualified immunity standard</u>

In general, a law enforcement officer is protected by qualified immunity if a reasonable officer in his position "could have believed" that his actions were consistent with the constitutional rights of the plaintiff. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The defense of qualified immunity provides plenty of room for mistakes in judgment by officers and is broad enough that it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). To determine if qualified immunity applies, the Court applies a two-prong assessment. Under the first prong, the nonmovant must present sufficient evidence to

10

establish that the officer violated a constitutional right. Without this showing, the officer prevails. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

Under the second prong, even if the nonmovant can present sufficient evidence of a constitutional violation, the officer is still entitled to summary judgment unless the nonmovant can prove that the law was so clearly established that *every* reasonable officer *would have known* the conduct was unconstitutional. *Id.* Stated conversely, if a reasonable officer "could have believed" his actions were constitutional, then he is entitled to qualified immunity under the second prong. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). Under this prong, the plaintiff must also introduce legal precedent to establish that the officers would have known that the use of deadly force would be unconstitutional in the particularized circumstances of this case - not in a broad generalized sense. *Brosseau v. Haugen,* 543 U.S. 194, 199-200 (2004). Although both prongs must be satisfied to deny Deputy Hunter qualified immunity, the Court can address the second prong first if it elects to do so. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Qualified immunity is also available to individual defendants under state law. *See Willis v. Neal*, 247 Fed.Appx. 738, 745 (6th Cir. 2007).

C.  Law on use of deadly force

The plaintiffs claim that Mr. Wright's constitutional rights were violated by Deputy Hunter's use of deadly force.

> The Fourth Amendment guarantees the right to be free from unreasonable seizures. This includes the right to be free from excessive force. *Graham v. O'Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Fourth Amendment's "objective reasonableness" standard governs whether an officer's force was excessive. *See id.* Deadly force is objectively reasonable when an officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

11

We analyze an officer's decision to use force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. We do so mindful that police officers face "tense, uncertain, and rapidly evolving" situations that require "split-second judgments." *Id.* at 397, 109 S.Ct. 1865. The Fourth Amendment only requires officers to act reasonably on the information they have; it does not require them to perceive a situation accurately. Cf. id. at 396, 109 S.Ct. 1865 ("The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested[.]") (citation omitted).

*Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017). In *Barnes v. Felix*, 605 U.S. 73 (2025), the United States Supreme Court found that an officer's decision to use deadly force must be objectively reasonable under "the totality of the circumstances," thereby rejecting Circuit decisions holding that a court can only consider the moment that deadly force was used. As the Supreme Court explained:

> … the "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in which they arose." Brief for United States as *Amicus Curiae* 14. Taking account of that context may benefit either party in an excessive-force case. Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

*Id., at 80-81.*

## IV.   CONCISE STATEMENT OF LAW AND FACTS

Under Count I, Deputy Hunter is entitled to qualified immunity under the first and/or second prongs of the qualified immunity test because his use of force that resulted in Mr. Wright's

12

death was objectively reasonable or a reasonable officer in Deputy Hunter's position could have believed his actions were objectively reasonable.

Under Count II, with respect to Mrs. Wright's claim she was seized by the gunfire, Deputy Hunter challenges whether firing his weapon at a shooter is a Fourth Amendment seizure of an unknown person. But if so, Deputy Hunter is entitled to qualified immunity because his conduct was objectively reasonable or an officer in his position could have believed it was objectively reasonable. With respect to Deputy Hunter taking Mrs. Wright into custody, his conduct was objectively reasonable or a reasonable officer in his position could have believed it was objectively reasonable because the officers believed the scene was not secure. With respect to Mrs. Wright's failure-to-intervene claim, that does not appear to apply to Deputy Hunter. With respect to Mrs. Wright's excessive force claim regarding the fact that she was struck by shrapnel from the bullet that hit her husband, that is a bystander claim under the Fourteenth Amendment's Substantive Due Process Clause. Deputy Hunter is entitled to qualified immunity under the first prong because his conduct did not violate the Substantive Due Process Clause. Alternatively, under the second prong, a reasonable officer could have believed that his conduct was not violative of Mrs. Wright's constitutional rights. In the final alternative as to that claim, if Mrs. Wright's shrapnel injury is a Fourth Amendment claim, then Deputy Hunter is entitled to qualified immunity for the same reasons as to the shot that killed Mr. Wright. Next, Mrs. Wright asserts a claim of a failure to provide adequate medical treatment, but she had no serious medical need. Alternatively, a reasonable officer could have believed she had no serious medical need.

13

Finally, Deputy Hunter is entitled to qualified immunity as to the state law claims of assault and battery, and intentional infliction of emotional distress for the same reasons he is entitled to qualified immunity as to the Section 1983 claims.

## V. ARGUMENT

### A. Deputy Hunter is entitled to qualified immunity under Count I

In Count I, the individual defendants are sued for the alleged unreasonable seizure of Mr. Wright. *See Doc. 1, PageID #: 21.* Specifically, as to Deputy Hunter, the claim in Count I is the claim of alleged use of excessive force. *Id., PageID #: 22 at ¶ 86.* With respect to the legal standard under the Fourth Amendment, it is "objective reasonableness," and in the context of deadly force the Sixth Circuit has cited to the Supreme Court as follows:

> Deadly force is objectively reasonable when an officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

*Thomas, supra, at* 365. In other words, the objectively reasonable standard does not require certainty prior to the use of deadly force. It is a "probable cause" standard that "the suspect poses a significant threat of death or serious physical injury." *Id.*

And in applying this probable cause standard, the Supreme Court has instructed that a reviewing court must analyze the officer's decision from the perspective of a reasonable officer on the scene, not with "20/20 vision of hindsight." *Id.* Consistent therewith, the Supreme Court has instructed that officers are only required to act reasonably on the information they have, it does not require them "to perceive a situation accurately." *Id.*

With respect to the time frame that this Court considers in applying this analysis, the Supreme Court has made it clear that a reviewing court should consider the "totality of the

14

circumstances." *Barnes, supra, at *4.* In order for this Court to analyze the totality of the circumstances, it is respectfully requested that the Court review Deputy Hunter's body camera recording from time marks 20:15:53 to 20:24:15. It is believed that Mr. Wright was shot and killed by one shot fired by Deputy Hunter at time mark 20:21:45. The relevant events leading up to the decision to use deadly force are: (1) gunfire erupted between Sgt. Tyner and a shooter inside the house while Sgt. Tyner was on the front porch and Deputy Hunter was close by, (2) Deputy Hunter knew that Sgt. Tyner was reporting that he had injured his leg, and that he may have been shot, (3) Deputy Hunter knew that regardless of Sgt. Tyner's exact injury, Sgt. Tyner initially hid under the front porch, and then was only able to retreat to the other side of the house; (4) as a result, Deputy Hunter knew that Sgt. Tyner was in an exposed position without the ability to seek cover, (5) Deputy Hunter was able to seek cover behind his cruiser that was parked approximately 55-70 yards from the front porch, (6) Deputy Hunter knew that he and the SPD officers with him were under heavy gunfire, (7) Deputy Hunter knew that part of the time, the shooter was firing from the back porch and that other times they did not know where the shooter was shooting from, and (8) because there had been shooting from inside the house out the front door and because there was shooting from the back porch, Deputy Hunter was concerned that there were two shooters.

With respect to the events right at the moment of deadly force being used, the time marks show the following:

mm. 20:21:01 Deputy Hunter is moving from one side of his cruiser to the other trying to get vantage points at the rear and front of the house because he doesn't know where the shooter is. Deputy Hunter says to SPD Sgt. Rademacher: "Where's he at?" Deputy Hunter is referring to the shooter.

nn. 20:21:37 SPD Sgt. Rademacher says: "I seen him [meaning the shooter] peek through the front door, so watch that." Deputy Hunter trains his rifle on the front door.

15

oo. 20:21:45 Deputy Hunter fires one round towards a person's head that he saw at the front door. At that moment Deputy Hunter did not know that he hit anyone. Deputy Hunter fired because he believed the person at the front door had a gun, and that their lives were in imminent danger, especially Sgt. Tyner whom Deputy Hunter knew was injured, possibly shot, just around the corner from the front porch, and unable to retreat to cover.

pp. 20:22:03 Deputy Hunter radios Sgt. Tyner and provides him the following information: "I'm behind my car. There is one at the front door with a gun where you are; if you can take a step back to the right, behind the house for me." At this point in time, Deputy Hunter is concerned that there are two shooters. Deputy Hunter is also concerned that if the shooter, that Deputy Hunter perceived at the front door, should come down the front porch steps that Deputy Hunter will not be able to fire his rifle for fear of hitting Sgt. Tyner. Therefore, Deputy Hunter is asking Sgt. Tyner that if he is able, to move further behind the house so that he does not accidentally shoot him.

qq. 20:22:13 SPD officer says to Deputy Hunter: "Do you see where he's at man?" Deputy Hunter responds: "There's one person … there's one at the front door." Again, Deputy Hunter believes there are two shooters.

rr. 20:22:22 Deputy Hunter asks the SPD officers around him: "Does anyone have the back door?" By this, Deputy Hunter is asking whether any officer is watching the back door because Deputy Hunter is watching the front door and he is concerned that there may be two shooters.

*Hunter Decl., ¶ 8 at these sub-paragraphs.*

Based on the totality of the circumstances analysis, a reasonable officer in Deputy Hunter's position had probable cause to believe he had the right to use deadly force. Therefore, Deputy Hunter should be granted summary judgment under the first prong of the qualified immunity test.

In the alternative, Deputy Hunter is entitled to summary judgment under the second prong of the qualified immunity test. The difference in the analysis between the first prong and the second prong can best be explained by looking to the qualified immunity analysis for the false arrest claim. Under the first prong, the question is whether the officer had probable cause for the arrest (*i.e.*, whether the seizure was objectively reasonable). If there was no probable cause, then under the

16

second prong the officer is still entitled to qualified immunity as long as a reasonable officer could have believed there was probable cause under the facts presented. Stated conversely, in order for the plaintiff to defeat the qualified immunity motion under the second prong, the plaintiff would have to prove that every reasonable officer would have known that there was no probable cause for the arrest.

Applying that analysis to the case at bar, Deputy Hunter is entitled to summary judgment under the second prong unless the plaintiffs can prove that under this set of facts no reasonable officer could have believed there was probable cause for the use of deadly force. When there is a tragic outcome, the human tendency is to review the events with 20/20 hindsight; but the Supreme Court forbids that type of analysis. The Supreme Court has explained why it does not permit 20/20 hindsight analysis:

> We do so mindful that police officers face "tense, uncertain, and rapidly evolving" situations that require "split-second judgments." *Id.* at 397, 109 S.Ct. 1865. The Fourth Amendment only requires officers to act reasonably on the information they have; it does not require them to perceive a situation accurately. Cf. id. at 396, 109 S.Ct. 1865 ("The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested[.]") (citation omitted).

*Thomas*, *supra*, at 365.

Moreover, as the Supreme Court has held, the officer is not required to have perceived the situation accurately. And unlike many cases reviewing an officer's use of deadly force, in the case at bar, deadly force had been used *against officers* out of the front and back of the residence, leaving one officer injured, possibly shot, and in an exposed position unable to seek cover. Based on the totality of the circumstances, Deputy Hunter, at a minimum, is entitled to qualified immunity under the second prong.

B. Deputy Hunter is entitled to qualified immunity under Count II

*i. Mrs. Wright's claims*

Mrs. Wright's claims are: seizure, excessive force, failure to intervene, and denial of adequate medical care. *See Doc. 1, PageID ##: 22-24 at ¶¶ 88-93.*

*ii. Analysis of Mrs. Wright's seizure claims*

Mrs. Wright alleges that she was unreasonably seized in at least one of two ways: (1) she was restricted from leaving her house by officers firing "indiscriminately into the house"; and (2) by handcuffing her and leaving her in a law enforcement vehicle for an extended time. *Id., PageID #: 22 at ¶ 89.*

As an initial matter, Deputy Hunter asserts that firing his weapon at a person whom he believed was firing at him and other officers was not a Fourth Amendment "seizure" of Mrs. Wright – whom Deputy Hunter did not know was in the residence. *Hunter deposition, p. 126, lines 2-13.* For this legal conclusion, Deputy Hunter adopts by reference the argument set forth in Sgt. Tyner's Memorandum Brief on this issue. *See Doc. 113, PageID ##: 974-975.* So for example, with respect to Mrs. Wright's claim that officers firing into her house was an unconstitutional seizure, Deputy Hunter is entitled to summary judgment under the first prong of the qualified immunity test because there was no seizure under the Fourth Amendment. In *Torres v. Madrid*, 592 U.S. 306 (2021), the United States Supreme Court was addressing the concept of seizure under the Fourth Amendment. As a basic proposition, the Supreme Court explained:

> A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. See *County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

*Id. at 317 (italics in original).*

Therefore, under the first prong of the qualified immunity test, Deputy Hunter is entitled to summary judgment because Mrs. Wright cannot show a seizure under the Fourth Amendment. In other words, there was no *intent* to restrain her by the officers firing their weapons at a shooter in her home. Alternatively, under the second prong, a reasonable officer in Deputy Hunter's position could have believed he was not seizing Mrs. Wright by returning gunfire from a shooter in her residence.

In the alternative, if Deputy Hunter firing his weapon at a shooter constituted a seizure of Mrs. Wright under the Fourth Amendment, his conduct was objectively reasonable under the first prong because officers were in positions of danger and dozens of rounds were being fired at them. In the further alternative, under the second prong of the qualified immunity test, there was no clearly established law that would have placed every reasonable officer on notice that returning gunfire under this circumstance would constitute an unconstitutional seizure of an unknown person in the residence.

Next, with respect to the seizure of Mrs. Wright once she exited the residence, that was a Fourth Amendment seizure. At that moment, the scene was not secure. Officers are trained to handcuff persons in dangerous and fluid situations for not only their protection, but for the citizen's protection as well. *Hunter Decl., ¶ 8.bbb.* For that reason, handcuffing her and placing her in the cruiser was objectively reasonable under the Fourth Amendment. Moreover, it was quite some time before the scene was secure. *Hunter Decl., ¶ 9.* Therefore, the fact that Mrs. Wright was kept in the cruiser for a period of time was not objectively unreasonable. As a result, Deputy Hunter is entitled to qualified immunity under the first prong of the qualified immunity test. Alternatively, under the second prong of the qualified immunity test, Mrs. Wright cannot show that every

19

reasonable deputy under these facts would have known that it was objectively unreasonable to handcuff her and place her in the cruiser for her safety and for officer safety until the scene was secure.

    *iii.  Analysis of Mrs. Wright's claims that she was subjected to excessive force based on the fact that she was struck by a bullet fragment when her husband was shot*

While Deputy Hunter's position is that Mrs. Wright's claim should be analyzed under the Substantive Due Process Clause of the Fourteenth Amendment, to the extent that the Court finds that her claim should be analyzed under the Fourth Amendment, then Deputy Hunter is entitled to qualified immunity for the same reasons addressed earlier as to why he is entitled to qualified immunity with respect to the shooting of Mr. Wright.

In the alternative, if the Court agrees that this is a Fourteenth Amendment claim, then Mrs. Wright's claim is a claim of an injury to a bystander. In *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), the Sixth Circuit explained:

> the Fourth Amendment "reasonableness" standard does not apply to section 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator, because the authorities could not "seize" any person other than one who was a deliberate object of their exertion of force. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Rather, constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official "seizure" are adjudged according to substantive due process norms. *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714–16, 140 L.Ed.2d 1043 (1998).

*Id. at 359 (italics in original).*

In *Claybrook*, *supra*, the Sixth Circuit set out the analysis for a claim under the Substantive Due Process Clause:

> Fundamentally, the substantive component of the due process clause insulates citizens against the arbitrary exercise of governmental power. *Id*. at 1716.

20

> Accordingly, conduct of a law enforcement officer towards a citizen which "shocks the conscience" denies the victim fundamental substantive due process. *Id*. at 1717. In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate's serious medical needs), their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. *Id*. at 1719. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, a prison riot), public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline[.]" 12 *Id*. at 1720 (citation omitted).

*Id. at 360.*

As demonstrated by a review of Deputy Hunter's body camera recording, this incident was a textbook example of: "a rapidly evolving, fluid, and dangerous predicament," which only "shocks the conscience" if Deputy Hunter fired his weapon "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Id. at 360.* Based on the same *factual analysis* as set forth regarding the Fourth Amendment claim regarding the shooting of Mr. Wright, Deputy Hunter is entitled to summary judgment under the first prong of the qualified immunity analysis as to Mrs. Wright's Substantive Due Process claim related to her shrapnel injury to her cheek. In the alternative, Deputy Hunter is entitled to summary judgment under the second prong of the qualified immunity test because a reasonable officer in Deputy Hunter's position could have believed that he was not violating Mrs. Wright's Fourteenth Amendment rights under the Substantive Due Process Clause based on the same facts presented as to the excessive force claim involving Mr. Wright.

    iv. *Analysis of Mrs. Wright's claim of failure to intervene*

This claim does not appear to apply to Deputy Hunter because he is the one who fired the shot that resulted in her shrapnel injury, and he is the one who took her into custody. But to the extent that this claim could apply to him, he is entitled to summary judgment under the first and second prongs of the qualified immunity test for the reasons set forth as to Mrs. Wright's claims of seizure and excessive force.

v. *Analysis of Mrs. Wright's claim of failure to provide adequate medical treatment*

To the extent that Mrs. Wright is alleging that Deputy Hunter violated her constitutional rights by failing "to provide adequate medical treatment," this is a Fourteenth Amendment claim. *Colson v. City of Alcoa, Tennessee*, 37 F.4th 1182, 1187 (6th Cir. 2022). With respect to articulating the Fourteenth Amendment standard, the Sixth Circuit has explained:

> After *Brawner*, to survive summary judgment on a deliberate indifference claim, a pretrial detainee must "present evidence from which a reasonable jury could find (1) that she had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and [the defendant] either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the detainee.]" *Id.* at 597.
>
> …
>
> It is undisputed that Ohlinger had an objectively serious medical need. *See Howell*, 67 F.4th at 311 ("An objectively serious medical need includes conditions that have been 'diagnosed by a physician as mandating treatment' or that are 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008))).

*Mercer v. Athens County, Ohio*, 72 F.4th 152, 160-61 (6th Cir. 2023).

In Mrs. Wright's case, her claim fails as a matter of law because she did not have a "serious medical need" based on her own deposition testimony. *See Deposition of Vickie Wright, p. 171, lines 7-17; p. 180, lines 19 to 25, and p. 196, lines 5-8.* In the alternative, Deputy Hunter is entitled

22

to qualified immunity under the first and/or second prongs of the qualified immunity test because: (1) there is no evidence that Deputy Hunter intentionally or recklessly ignored a serious medical need, and/or (2) a reasonable officer could have believed that Mrs. Wright did not have a serious medical need. *See e.g., Hunter Decl., ¶ 8 and Exhibit A at time mark 20:26:45.*

    C.  <u>Deputy Hunter is entitled to qualified immunity under Count VII</u>

    *i.  Plaintiffs' claims*

In Count VII, the plaintiffs sue the individual defendants under state law for assault and battery. *See Doc. 1, PageID #: 36.*

    *ii.  Law*

With respect to an officer's use of force, the Tennessee Supreme Court has explained that an officer is privileged to only use the force necessary and can be held liable for assault and battery for using excessive force. *City of Mason v. Banks*, 581 S.W.2d 621, 626 (Tenn. 1979). Tennessee courts employ the same excessive-force analysis in assault and battery claims as federal courts under § 1983. *Harris v. Metro. Gov't of Nashville*, 2007 WL 4481176, *9 (M.D.Tenn. 2007).

    *iii.  Analysis*

Based on the law just cited, combined with the fact that law enforcement officers in Tennessee can assert the defense of qualified immunity to state law claims, Deputy Hunter is entitled to qualified immunity on the same bases that he is entitled to qualified immunity as to the plaintiffs' claims of excessive force under Section 1983.

    D.  <u>Deputy Hunter is entitled to qualified immunity under Count VIII</u>

    *i.  Plaintiffs' claims*

23

In Count VIII, the plaintiffs sue the individual defendants under state law for the intentional and/or reckless infliction of emotional distress. *See Doc. 1, PageID #: 36.*

*ii. Law*

In *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1 (Tenn. 2021), the Tennessee Supreme Court set forth the "high burden" on a plaintiff seeking to prove the intentional infliction of emotional distress:

> The elements of an intentional infliction of emotional distress claim are that "the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012).

> The burden for a plaintiff to demonstrate outrageous conduct is a **high burden** indeed . . . This Court has endorsed the **"high threshold"** standard stated in the Restatement (Second) of Torts:

> > The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

> *Bain*, 936 S.W.2d at 622–23 (quoting *Medlin*, 398 S.W.2d at 274; Restatement (Second) of Torts § 46 cmt. D (Am. L. Inst. 1965)). The Restatement recognizes that "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." Restatement (Second) of Torts § 46 cmt. H; *see Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 704 (Tenn. Ct. App. 2012).

*Id. at 21 (bold added).*

24

*iii. Analysis*

Based on the law just cited, combined with the fact that law enforcement officers in Tennessee can assert the defense of qualified immunity to state law claims, Deputy Hunter is entitled to qualified immunity on the same bases that he is entitled to qualified immunity as to the plaintiffs' claims of excessive force under Section 1983. In other words, if Deputy Hunter's conduct did not violate the plaintiffs' rights under the Fourth and Fourteenth Amendments – *or if Deputy Hunter is entitled to qualified immunity under the second prong as to the Fourth and Fourteenth Amendment claims* – then as a matter of logic, the plaintiffs cannot meet the "high threshold" of outrageousness. Therefore, Deputy Hunter is entitled to summary judgment under the first and/or second prongs of the qualified immunity test.

## VI. CONCLUSION

Based upon the foregoing, Deputy Hunter is entitled to summary judgment based upon qualified immunity and all claims against him should be dismissed with prejudice.

Respectfully submitted,

*s/ Jeffrey M. Ward*
JEFFREY M. WARD, BPR # 016329
HERRIN, McPEAK, SHEPARD & KETCHIE
P. O. Box 629
Johnson City, TN 37605-0629
423 929-7113
423 929-7114 facsimile
jward@hmsklaw.com

Attorney for defendant, Deputy Mark Hunter, in his individual capacity

25