**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | |
|---|---|
| **VICKIE WRIGHT, individually and as next** | **)** |
| **friend and wife of David Wright, Deceased,** | **)** |
| | **)** |
| **Plaintiff,** | **)** |
| **v.** | **: Case No. 3:24-CV-00220-TAV-DCP** |
| | **)** |
| **SEVIER COUNTY, TENNESSEE,** *et al.,* | **)** |
| | **)** |
| **Defendants.** | **)** |

**PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO**

**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# Table of Contents

**Page No.**

Introduction ..................................................................................................................1

Statement of Facts.........................................................................................................4

Defendants' Summary Judgment Motions....................................................................34

Standard of Review.......................................................................................................36

Plaintiff's Pending Motion to Amend ..........................................................................37

Argument .....................................................................................................................38

    I.   The Individual Defendants unlawfully seized David and Vickie Wright by surrounding their Home, invading their curtilage—some with guns drawn, deploying K-9's on both the front and back porches, and threatening forcible entry without a warrant ....................................................................................................38

        A.  Unconstitutional seizure occurs if police officers surround a home without a warrant and with a show of authority that would make a reasonable person believe they were not free to leave or that they would be compelled to comply with the officers' demands .........................................................................38

        B.  Defendants unreasonably seized the Wrights through a warrantless and unjustified constructive entry of their home .........................................................40

        C.  The prohibition on warrantless constructive entry was clearly established before May 2023 .....................................................................................................41

        D.  Defendants' proffered justification lacks merit.......................................................41

    II.  Several Defendants unlawfully seized David and Vickie Wright by improperly shooting into their home ..........................................................................................42

        A.  Unless the shots are accidental, officers' shooting into a home seizes all its occupants, regardless of whether the officers know they are there .......................42

        B.  A rational jury could find that law enforcement's shots into the Wrights' home were objectively unreasonable ...................................................................43

        C.  The applicable law was clearly established before May 2023.............................46

        D.  Defendants' arguments rest on disputed facts.......................................................47

ii

III. As the joint operation continued, Deputy Hunter unlawfully seized and killed David Wright and struck Vickie Wright with bullet fragments while Mr. and Mrs. Wright were unarmed, not threating anyone, and cooperating with officers ...............50

    A. The Fourth Amendment prohibits shooting an unarmed, non-dangerous citizen ...............................................................................................................50

    B. The shot that killed David was objectively unreasonable .....................................51

    C. The applicable law was clearly established before May 2023 ...............................52

    D. Hunter's argument depends on disputed facts and credibility ...............................53

IV. Vickie Wright was unlawfully seized when she was handcuffed and put in the back of a police cruiser .................................................................................................55

    A. Investigative detentions must have a reasonable basis and last no longer than necessary ...................................................................................................55

    B. It was unreasonable for Deputy Hunter to detain Vickie Wright by handcuffing her and placing her in a police cruiser ...............................................56

    C. The applicable law was clearly established before May 2023 ...............................57

V. The City of Sevierville and Sevier County are both liable under § 1983 claims for the conduct of their law enforcement officers because their policies caused the Wrights' rights to be violated .........................................................................58

    A. Municipalities are liable under § 1983 claims if their policies, practices, or training cause a violation of an individual's rights ...............................................58

    B. A jury could reasonably find the City of Sevierville and Sevier County liable under *Monell* ...................................................................................................60

VI. Plaintiff meets all the elements of her state law claims ...................................................64

    A. The intentional torts at issue do not require that the tortfeasor intend to affect the eventual victim ...............................................................................................64

    B. The Individual Defendants engaged in assault, battery and intentional infliction of emotional distress ...................................................................................65

    C. Defendants are not entitled to qualified immunity on the state law claims ...........66

VII. Defendants rely on facts that are irrelevant, inadmissible, and plainly disputed .........66

    A. References to Higdon's "charges" are inadmissible ...............................................66

    B. Higdon's guilty plea for his conduct during these events is inadmissible .............68

iii

C.  Virtually all of the TBI file materials are irrelevant and inadmissible...................69

D.  Whether Vickie Wright Should Have Been Aware of Higdon's Firearms and
Drug Paraphernalia is Not Relevant .......................................................................71

Conclusion  ..........................................................................................................................72

iv

## **<u>Introduction</u>**

On May 12, 2023, David Wright was shot in the head and killed by law enforcement in the front doorway of his home during a joint operation by the Sevier County Sheriff's Office ("SCSO") and the City of Sevierville Police Department ("SPD") (the "Joint Operation"). Mr. Wright was unarmed, was not threatening anyone, and was cooperative with the officers. Vickie Wright, Mr. Wright's wife of nearly thirty years, was immediately behind him when he was shot. Shards of shrapnel from the bullet that struck Mr. Wright's head struck and pierced Mrs. Wright's face as Mr. Wright slumped into her and then to the foyer floor. Mrs. Wright also was unarmed, was not threatening anyone, and was cooperative with the officers.[1]

**Extensive Video Footage is in the Record, Including From Surveillance Cameras**

There is an unusual amount of real time video footage of the events at the Wrights' home that evening. The record contains not only the body cam footage from the officers involved in the Joint Operation, but also views of both the front and the back of the Wrights' home. Accordingly, there is objective video evidence of what occurred from multiple angles and perspectives.

The law enforcement agencies involved elected not to sync the officers' body camera footage with the footage from both of the two available surveillance video cameras to confirm the relative location and activities of persons at critical times, the relative timing of the events from different views, and objective evidence of the officers' seizures and uses of force. Plaintiff did. Composite videos, as well as excerpts of several videos, are being contemporaneously submitted with this Response and are cited herein.[2]

---

[1] *See* Video Ex. 20; V. Wright Decl. at ¶ 24; Ex. 12 (pictures of Mrs. Wright's face taken just hours later showing the numerous shrapnel wounds) .

[2] Patrick A. Eller, a digital forensics expert with a background in military and law enforcement investigations, did this work. *See* Eller Decl., Ex. 1. *See also* Ellis Decl., Ex. 2, verifies that the videos used for those composite videos, as well as other items, were produced in discovery.

1

Patrick A. Eller, a digital forensics expert with a background in military and law enforcement investigations, did that work in this case. *See* the Declaration of Patrick Eller with accompanying and referenced exhibits, contemporaneously filed as Ex. 1.

<div align="center">

**Overview of Events[3]**

</div>

The City's and County's Joint Operation began with an unlawful, warrantless seizure of the Wrights' home.[4] The officers involved in the operation were looking for Vickie Wright's brother, Daryl Higdon, who had failed to stop for one of the officers, SPD Officer Jacob Reece, for a traffic offense earlier that evening (driving on a suspended license). Although Higdon did not speed or drive recklessly to evade Officer Reece, driving around 35 mph, traffic was heavy and Officer Reece did not pursue, following the City's no pursuit policy. *See* Video Ex. 1. However, since Officer Reece had Higdon's address from running his tags, he discussed with his supervisor, Sgt. Rademacher, going to look for Higdon at that address a little later that evening with other officers. *Id.* at 66:19-67:6. They discussed whether to get a warrant, but decided to proceed without one. Video Ex. 1; Reece Dep. at 64:13-65:10.

The address -- 2739 Holly Drive – was David and Vickie Wright's home. The Wrights were allowing Higdon to stay at their home for several months to try to get back on his feet and Higdon had used the Wrights' address for his registration. V. Wright Decl. ¶¶ 1, 7.

Although no exigent circumstances existed, the officers did not bother to get a warrant. Nevertheless, after boasting in a text thread what they would do to Higdon when they found him and meeting up at a school briefly near the Wrights' home, six officers from the City and County got together, including the entire SPD Special Operations Unit on that shift, a ranking County

---

[3] Citations to the record accompany the more detailed Statement of Facts, *infra.*
[4] It is undisputed that the officers did not have a warrant, *see, e.g.,* excerpts of hearing testimony by SPD Officer Reece and SCSO Sgt. Tyner attached as **Ex. 30** at 79:11-13, 122:7-9.

<div align="center">2</div>

Officer, and a County Field Training Officer, and surrounded the Wrights' home, many with weapons drawn, deploying K-9's both on the front and back porch and threatening forced entry if the doors to the Wrights' home weren't opened. Alarmed and afraid by their aggression and tactics, Higdon got an AR style weapon from the closet of his bedroom and assumed a defensive position in a small hallway near the foyer.

When David Wright eventually opened the door, one of the officers who saw Higdon's gun pointed towards the ceiling, opened fire at Higdon when Higdon did not put his gun down when commanded to do so. Higdon then returned fire with the officers in front at point blank range, but deliberately aimed his shots into the floor of the foyer and away from the officers before going out the back door of the Wrights' home onto the back deck, hoping to get away. But Higdon could not get all the way down the back deck stairs on the southeast corner of the Wrights' home without being exposed to four of the officers who had repositioned on the front corner of the property. Higdon and the officers then exchanged sporadic gunfire for approximately two minutes.

Higdon, an honorably discharged veteran who had shot guns since he was ten years old, testified that he did not aim at any of the officers, was not trying to hit any of them, sometimes shot out to the side and sometimes in their general direction. None of the officers was hit by any of the shots Higdon fired. Higdon, though, was hit four or five times by shots fired by law enforcement. As video evidence and testimony confirm, Higdon put his gun down, stopped shooting, and moved away from the corner of the house where he was no longer visible to the officers. Higdon then attempted to come back inside the Wrights' home through the back door on the upper part of the back deck.

However, once it got quiet and the shooting stopped, David Wright, who along with Vickie had been trying to take shelter in their bedroom on the southeast corner of their home, decided to

3

lead Vickie to the front door and outside. Thirty-six (36) shots had been fired by law enforcement into the east side of the Wrights' home adjacent to the Wrights' bedroom. When they were close to the front door and saw Higdon trying to come in the back door, they yelled at him to get back outside on the back deck and he did.

Video evidence shows that Vickie Wright appeared in the front doorway for several seconds, and then David Wright moved in front of her, wanting to look out first and putting Vickie behind her. Neither of them was armed and each of them, by physical appearance as well as clothing, looked markedly distinct from Higdon.

One of the officers at the front right corner of the Wrights' home, recognizing David Wright as the one who had opened the front door initially, engaged David in conversation, asked him where Higdon was, and told David to "come out." Very shortly thereafter, another officer, farther away on the opposite side of the Wrights' front yard, shot David in the head and killed him and struck Vickie with a forceful spray of shards of bullet fragments.

Several minutes later, Vickie came out the front door. She was ordered towards the officers and, though not a threat, unarmed and not attempting to flee, was handcuffed behind her back, put in a cruiser, and left for more than an hour and a half.[5]

### Statement of Facts

**David and Vickie Wright**

David and Vickie Wright were just days away from their 30th wedding anniversary when these events occurred on May 12, 2023. They built their home at 2739 Holly Drive in Sevier County not long after they were married. Vickie has worked for nearly 30 years as a branch administrator for a financial services firm in Pigeon Force. David was a very hard worker and was

---

[5] Higdon came out several minutes later, was arrested, and was taken to the hospital by ambulance.

4

one of those persons who could fix anything. He had worked in maintenance for Tennessee State Bank for many years. V. Wright Decl, Ex. 6.

Vickie's children, Teresa Ramsey and Brian Ramsey both were very young when Mr. and Mrs. Wright married; they viewed him as their father and were very close. Teresa also works for a financial services firm in Sevierville. *Id.* Brian is a State Trooper with the Tennessee Highway Patrol, where he's served a variety of roles including SWAT, K-9 operations, and in the motor carrier division. He formerly worked for the Sevier County Sheriff's Office. B. Ramsey Dep. at 15, 18, 24, 115–116. Vickie has a stepdaughter, five grandchildren, two step grandchildren, and three great grandchildren. V. Wright Decl, Ex. 6 .

**Vickie Wright's Brother, Daryl Higdon**

Daryl Higdon is Vickie's older brother. They grew up in Knoxville. Their father was an engineer in Oak Ridge. Their mother was killed by a drunk driver when they were very young – Vickie five, Daryl six. Their father subsequently remarried. He is deceased; their stepmother died in 2015. When they were growing up, Daryl spent a lot of time in the summers with their grandfather, who had a farm. Their grandfather and uncle got Daryl a .22 rifle when he was 10 and taught him how to shoot. They would shoot targets on the farm. Daryl has always been interested in guns since then. V. Wright Decl, Ex. 6, ¶¶ 2-4.

Higdon served in the army in ground infantry and had firearms training. He enlisted soon after high school, was stationed at Fort Jackson, and was honorably discharged. He had firearms training in the army. Higdon Dep. at 92:17–93:11.

David and Vickie Wright were allowing Higdon to stay at their home to try to help him get back on his feet. Higdon had worked construction from time to time. However, Daryl has had challenges with alcohol and drug dependency since he was a teenager. He has been in and out of

rehab. Vickie was aware that he had been convicted of some criminal offenses in his adult life and had served time in prison on several occasions. V. Wright Decl., Ex. 6 ¶ 6. Because Higdon had been in and out of prison several times, it was hard for him to find employment. When he got out of prison in the fall of 2022, he did not have anywhere to go. David and Vicki allowed him to stay with them for a while with the expectation that he was going to find someplace else to live. V. Wright Dep. 82:9–83:3.

The Wrights were hoping that living with them for relatively brief periods would provide a stable environment and would help him get on his feet. They felt like it was the right thing to do to help him out and give him chances to recover. Despite his challenges, the Wrights found Higdon to be a good person when he was able to stay clean. On a recent occasion when he stayed with them, David's mother was staying with them because she had cancer and was bedridden. Higdon served as her primary care giver during the day while David and Vickie were at work and he was great with her. V. Wright Decl., Ex. 6 ¶ 7.

The last occasion Higdon stayed with the Wrights was from September 2022 until this incident occurred on May 12, 2023. During that time period, Higdon seemed to be doing pretty well overall. Vickie did not see him using alcohol or drugs during that time period. Also, she never saw Higdon in the possession of a firearm during that time. As she testified previously, David had told her a few months before the incident that he had seen Higdon with a gun on one occasion and immediately told him to get rid of it. Higdon assured David that he would and that he did. David believed he had handled the situation and that Higdon had gotten rid of the gun. The Wrights did, though, ask Higdon to try to make progress finding another place to stay. Although it's evident now that Higdon did not keep his word and that he brought firearms into the Wrights' home, Vickie never saw them or had any indication that he had any of them or any ammunition. She did not go

6

in his room out of respect for his privacy and on occasion when his door was open, she did not see any firearms, drugs, or alcohol. V. Wright Decl., Ex. 6 ¶ 8.

**Brian Ramsey Previously Arrests Higdon Without Incident in the Past When there was a Warrant for Higdon's Arrest**

A few years ago, there was a time when there was a warrant out for Higdon's arrest when Brian Ramsey was working for the Sevier County Sheriff's Office. Brian told Higdon about it and that he would have to arrest Higdon and take him in. Higdon cooperated with him and went to the sheriff's office to turn himself in without any resistance whatsoever. Higdon Dep., 103:8–104:7.

**Friday Evening, May 12, 2023**

Friday evening, May 12, 2023, started out as a normal evening for the Wrights. Vickie had gone to the store after getting off from work and fixed dinner. David mowed the yard after getting off from work. After dinner, they were downstairs watching TV in the den. Daryl came in with a Hobby Lobby bag and didn't say much other than greeting them before walking upstairs. V. Wright Decl., Ex. 6 ¶ 9. By happenstance, the Wrights' grandchildren were not staying with them that evening.

**Higdon Fails to Stop for Officer Reece in Sevierville**

Earlier in the evening, Higdon was driving in Sevierville and caught the attention of SPD Office Reece, who decided to run his tags. He was found to have a suspended driver's license. Officer Reece activated his blue lights, but Higdon didn't pull over. For a time, Officer Reece wasn't certain Higdon intended to evade because he continued to drive around the speed limit. Eventually, though, he appeared to be taking evasive maneuvers in traffic. Reece terminated the pursuit pursuant to SPD policy and, since he had Higdon's registered address, discussed with his

7

supervisor what next steps to take.  Video Ex. 1 – Reece initial pursuit (Office Reece body cam excerpt).[6]

**Officer Reece and Sgt. Rademacher Decide to Get a Group of Officers Together, Meet at a School, and Go to the Wrights' Home Without a Warrant.**

Officer Reece and Sgt. Rademacher discussed whether to get a warrant. Reece confirmed that he could have gotten a warrant, but they decided not to. *See* Reece Dep. at 64:13–65:17. Sgt. Rademacher testified that he believed the pursuit was terminated because there was no information that Higdon had committed a violent felony. Rad. Dep. at 45:15– 16. As Sgt. Rademacher also acknowledged during his deposition, there were no exigent circumstances present, and they were not in hot pursuit. Instead, they got a group of officers together and agreed to meet at the New Center School, which is near the Wrights' home:

> Q. Did you think, say, at New Center School . . . did you think any of those circumstances for warrantless entry to effectuate an arrest applied to Mr. Higdon that evening?
> A. At that time, no, because there was no exigency, hot pursuit, none of the warrantless exceptions. That's more of like an exigent circumstances thing. So at that time, we didn't-
> Q. You didn't what? You weren't planning on going into the house?
> A. No, sir. We weren't planning on walking up there and just going inside the house, no, sir.
> Q. Do you recall if you had a thought about what you and your officers would do if Mr. Higdon refused to come out?
> A. Are you asking if we had a plan?
> Q. I'm asking if you had thought about that that evening, what you and your officers would do?
> A. I don't recall what I was thinking, to be honest. I don't recall.
> Q. You don't recall discussing any kind of plan like that with your officers, though. Isn't that right?

---

[6] Higdon testified initially that he assumed there was a warrant for his arrest because he had not reported: "when you don't report, you usually get a warrant," but then he said he didn't know what the warrant would be related to. Higdon Dep. 45:9–22. When later ask what had he done that made him think there was a warrant out for him, he answered: "I didn't think there was." *Id*. at 73:17–19. He testified that he was not supposed to be reporting to any probation officer. *Id*. at 73:20–23. When again asked whether there was a warrant out for his arrest, he testified he did not think there was. *Id*. at 77:15–19. Higdon did not know why the officer was trying to pull him over. *Id*. at 78:3–6.

A. Correct. I don't recall having that conversation.

Rademacher Dep. at 75:8 – 76:10.

In fact, far from there being exigent circumstances or a "hot pursuit," and while not bothering to get a warrant, the four SPD officers involved did have time to engage in an extensive text thread with one another on their phones before meeting with the County officers, joking and bragging back and forth about what they were going to do to Higdon if they found him (such as "I'll wreck his a\*\*, and using multiple emojis).[7] *See* the SPD pre-Joint Operation text thread, attached as **Ex. A**.

**Officers Share Little Information, Relying On their Custom and Practice About How to Approach the Wrights' Home Without a Warrant.**

Since the address was in the County, two County officers accompanied four City officers. They connected briefly at a nearby school and then, after minimal discussion between them, drove to the Wrights' address. Tyner Dep. at 83:10-84:12; 92:7- 94:11. Just as they did not get a warrant, the officers involved in the Joint Operation did not determine who owned the home, did not consider who might be present in the home, did not confirm a common radio channel to communicate with one another at the scene, did not confirm who would be in command at the scene, and did not confirm that each officer even knew Higdon's background or appearance. The officers testified that this approach was consistent with their training and their respective departments' customs and practices in the field.

Moreover, the record establishes that this sort of casual, warrantless approach to attempting an arrest at a private residence was so routine and customary for these officers – which included ranking officers of the City and County and the City's entire Special Operations unit on that

---

[7] Presumably, each of them had their cruiser parked – and was not driving – each time each officer sent a text.

evening's shift, that the officers had and needed minimal communication about how and where they would deploy when they arrived at the Wright's home. The record confirms that this sort of Joint Operation between members of these departments was so customary – so much of a pattern and practice – that the officers instinctively knew what to do and how to do it as a group when they arrived at the Wright's home.

Deputy Hunter, for example, testified that he did not recall any discussion of a warrant, Hunter Dep. at 62:5–13; he had his gun drawn as soon as he got out of patrol vehicle and he normally does that when doing a warrant service or something like that. *Id.* at 57:16–22; he testified that he and Sgt. Tyner had served many warrants together, and they did exactly what they always do; and looking back, wouldn't change anything about approach. *Id.* at 53:21–54:24. Hunter also acknowledged that he knew that none of the officers had a warrant at the time they arrived at the Wrights' home. *Id.* at 163:5-8.

Sgt. Tyner testified that they could do a knock and talk without a warrant. Tyner Dep. at 67:5-7. He also testified that while he did not feel he had the ability to kick somebody's door in or breach without a warrant, sometimes "you threaten to do that as a bluff" and admits he has done that before. *Id.* at 180:1-5. When testifying at a motion hearing in Higdon's resulting criminal proceeding, Tyner acknowledged that as they approached the Wrights' home, they did not have a warrant. June 26, 2024, Hearing Tr. At 122:7-9.

Officer Reece also acknowledged that they did not have a warrant when arriving at the Wrights' home. *Id.* at 79:11-13.

In the County's 30(b)(6) deposition, Chief Carr said that he did not know why the arrest warrant was obtained the day after, instead of the day of the incident. County 30(b)(6) at 19:17–20:9. Asked about Exhibit 10, Capt. Morton's statement, which describes Sgt. Tyner as reporting

10

he and Dep. Hunter had responded with SPD to attempt to serve a warrant for evading arrest, Carr acknowledged, contrary to the Captain's written report, that there was no warrant obtained prior to the incident. *Id.* at 74:16–754.

Sheriff Hodges testified that he believes officers are allowed to approach guns drawn and surround the house without a warrant and stated that if there's enough information to believe suspect is there, they can threaten to enter the house forcibly. Hodges Dep. at 118:9–119:12.

Officer Paul did not know if anyone had a warrant when they were approaching the house. Paul Dep. at 30:7-8.

Of note, Det. Vandergriff of SCSO testified that in planning operations like warrant service or residence searches, it's important to know occupants of residence; to know of any safety concerns prior to going in; that includes the safety of people inside that aren't the target. Vandergriff Dep. at 23:12–22; 24:4–12.

Deputy Hunter acknowledged that up to the point they saw the person who turned out to be Higdon on the back deck, "we" didn't have a suspect description. Hunter Dep. at 53:21–54:15

Officer Paul did not know if the suspect's description was for a white male in a black shirt or black male at the time he knocked on the back door and gave commands. Paul Dep. at 32:23-33:25. He gave the command to open up the door "or we're coming in" and gave command to K9 Hank to bark. *Id.* at 79:2-8. He testified that there were no discussions or radio transmissions at the house that alerted everyone that someone other than the suspect was in the house. *Id.* at 91:16-92:25.

Officer Verez, when discussing whether anyone communicated on the scene that people other than Higdon were inside the residence, Verez testified that "it's always a concern if there's somebody in the house," before acknowledging that during the incident he did not know who was

11

in the house and no one informed him of other people being in the house. Verez Dep. at 100:14-21. He agreed that he didn't know whether there might be other adults or even children or grandchildren inside the residence at that time. *Id*. at 102:19-23.

**Officers Surround the Wrights' Home, Some With Guns Drawn, Deploy K-9's on Both the Front and Back Porches, and Threaten Forcible Entry Without a Warrant**

The six officers involved in the Joint Operation – including the entire SPD Special Operations Unit on that shift, a ranking County Officer, and a County Field Training Officer, surrounded the Wrights' home, entering the curtilage in both the front and the back. The ranking SCSO officer, Sgt. Bart Tyner, and a member of the SPD special operations unit, K-9 Officer Jacob Reece, entered the front porch. The ranking SPD officer on scene, Sgt. Jacob Rademacher; an officer from SCSO, Deputy Mark Hunter; and two other members of the SPD special operations unit, Officer Nestor Verez and K-9 Officer Jordan Paul, entered the back deck. Officer Reece deployed his K-9 to the front door; Officer Paul deployed his K-9 to the back door. Some of the officers had their weapons drawn as they entered the back deck and approached the back door. Sgt. Tyner then threatened to enter the Wrights' home forcibly if the front door wasn't opened. Near the same time, Officer Paul threatened to enter the Wrights' home forcibly if the back door wasn't opened.[8]

It is well recognized that any of those actions, and certainly all of them together, seized the Wrights' home and everyone in it. Because the officers did not have a warrant, the seizure was unlawful. Yet all of the officers as well as the Sheriff and Police Chief testified that the officers were following their training, as well as the customs and practices of their respective departments

---

[8] Video Exs. E, 4, 5, 6, 12 and 13.

when doing so. Further, statements in the City's and the County's recent filings in this case confirm that the officers' actions were a matter of routine and instinct in these sorts of joint operations.

Higdon testified that if there is a video showing him on the back deck smoking a cigarette when officers approached the back of the Wright's house, he would not dispute it. He acknowledged that he was wearing a black shirt and a do-rag the day of the incident and that's what he was wearing when he had been out driving beforehand. *Id*. at 80:6–23.

Higdon remembered officers banging on the front door and shouting that they were going to come into the house if the door was not opened. *Id*. at 80:24–81:6.

Higdon told the officers at the front door to "Go away" and then says "no" when asked again to open the door.  Video Ex. 13.

**When the Officers Refuse to Leave and Threaten Forcible Entry; Higdon is Afraid and Gets a Gun from his Room.**

Higdon recalled seeing that there were officers who had drawn their weapons – had their pistols drawn, and that made him afraid. Higdon Dep. at 81:7–12.

Higdon said when he first saw the police officer at the front door, he did not already have a weapon but that he went and got the weapon in the closet of his bedroom after he saw the officer at the front door. *Id.* at 53:1–14.

Higdon testify that he had a gun that was pointed in the air (later clarified to mean towards the ceiling) and was asked why he had a gun – he answered, because the police officer "had one out." *Id.* at 50:19–22.[9]

---

[9] Higdon testified that the gun was in his closet under lock and key. The ammunition was hidden under the bed. If someone was standing in the doorway, they could not see either the guns or the ammunition. Higdon did not leave them out in the open because he knew David and Vicki would make him get rid of them or make him leave. Id. at 84:11–85:10.

**Hearing "Loud and Angry" Voices, David Wright Opens the Front Door After Officers Had Threatened Forcible Entry Both at the Front and Back Doors.**

While downstairs in the den with David watching TV, they heard what sounded like loud and angry voices upstairs. David went up to investigated and Vickie followed a short time later. As she was ascending the stairs, she could tell that the loud and angry voice was someone other than David or Daryl at the front door. V. Wright Decl., Ex. 6 ¶ 10.

Video evidence with time synchronized stamps makes clear that David Wright only opens the door after he comes up in response to "angry, loud" voices, after Higdon tells the officers to "go away" and then communicates his refusal to open the door, after Officer Paul has threatened to enter forcibly through the back door, and after Sgt. Tyner threatens to kick the door in if the door isn't opened.

From Video Evidence of the conduct on the Wrights' back porch, where several officers had their weapons drawn and a K-9 was deployed:  (Video Ex. 4 – Paul composite excerpt):

Paul on the back deck with K-9 at 00:00:17:00

Paul:   "Hey, we need uh, kick if it's him"    (00:00:21:26)

Rad:    "I don't know if it's him." (00:23:15)

Paul:   "Sevier Police Department, K-9 Unit, better open the door, we're coming in. (00:00:25:15 – 00:00:27:00)

Paul:   "Pass off."  (00:00:29:00). K-9 begins to bark aggressively (00:00:29:12 – 00:00:31:10).

Paul:   "Did he say black male?"  (00:00:36:23)

Rad:    "No."

Paul:   "Was it a black male?" (00:00:39:15)

Hunter:  "No, it was a white guy."  (00:00:40:10)

Rad:    "Was he a black male?"  (00:00:46:00)

Rad:   "White male, goatee, black shirt."  (00:00:46:20)

Paul:   "White male, goatee, black shirt." (00:00:49:24)
"Reece, did he have a black shirt?"  (00:00:58:00)  "Was he a white male with a black shirt and a goatee."  (00:01:00:00)

Rad:   "He probably might not get service."  (00:01:06:28)

Paul:   "It's SPD, come to the door with your hands in the air. Do it now, or we're coming in."  (00:01:12:00)

From Video Evidence of the conduct on the Wrights' front porch, where Sgt. Tyner and Officer Reece were with Reece's K-9 deployed:  (Video Ex. 13 – four-way composite with Tyner audio):

Tyner:  You'll want to come to the front with me since it's your all's charge?  (00:00:04:08)

Going up the front steps, he asks, "Daryl Higdon, right?"  Opens the glass screen door and knocks on the front door at 00:00:37:15 – 00:00:44:05)

Higdon:  "Go away."  (00:00:46:07)

Tyner:  "Daryl Higdon, Sheriff's office, Come to the door."  (Ring doorbell rings twice.)  (00:00:47:29 – 00:51:28)

"Daryl Higdon, come to the door, we're not leaving. (00:00:53:24 – 00:0055:10)

Tyner:  "Hey, he's right here. He's right here. Come ID him."  (00:00:58:24)

Tyner:  "Come out."  (00:01:03:14)

Higdon:  "No."  (00:01:04:24)

Tyner:  "We're going to kick the door, if you don't'. (00:01:05:00 – 00:01:05:24)
"Is that him?"  (00:01:07:00).
Tyner knocks on the door again at 00:01:10:05

David Wright opens the door at 00:01:15:17.

**David Wright Has a Markedly Different Appearance than Higdon.**

When David Wright opened the door, he was unarmed and was acting cooperatively. He also was markedly different in physical appearance than Daryl Higdon. David was balding, shorter,

15

heavier built, and wearing a light colored t-shirt. Higdon was taller, skinny, wearing a black t-shirt, durag, and had a goatee. Video Ex. 13. As Office Reece noted at the June 26, 2024, motion hearing in Higdon's case, the first person he saw was an older white male with white hair wearing a bright blue T-shirt and "obviously it wasn't (Higdon)" June 24, 2026, Hearing Tr. at 82:1-8. That gentleman was not armed and did not cause Reece any concern. *Id.* at 83:18-24.

**Higdon Was in a "Defensive Posture" Behind a Wall off the Foyer with his Gun Pointed Towards the Ceiling.**

Soon after David Wright opened the door, Officer Reece noticed Higdon in a "defensive posture" behind a wall about ten feet away. Higdon had a gun, but it "was not in a shooting position." Hearing Tr. at 85:2-7. Higdon's gun was pointed toward the ceiling. Higdon Dep. at 88:11-89:2.

**Law Enforcement Fires First at Higdon.**

When Sgt. Tyner saw that Higdon had a gun, he yelled at him to put the gun down. When the officer yelled at him to put the gun down, the barrel of Higdon's gun was pointed toward the ceiling. Higdon did not put the gun down, but he did keep the barrel pointed toward the ceiling. He only lowered the gun after the officer fired at him. He never lowered the barrel from being pointed at the ceiling at any time before the officer shot at him. Higdon Dep. at 88:11–89:2. When Higdon didn't put the gun down and chambered a round, Tyner fired twice at Higdon, aiming at where he thought Higdon's "center of mass" would be on the other side of the wall. Tyner Dep. at 104:11-15; 115:7-17.

**Higdon Fires His Gun Towards the Floor to Miss Sgt. Tyner.**

When Higdon fired, he fired his shots into the floor, on the ground. 56:19–24. Higdon returned fire into the floor or lower part of the adjacent wall so that he would miss the officer. The officer was just a few feet away and if he wanted to shoot him, he could have shot him several

times. But he did not want to do that, so he shot at the wall or ground instead.[10]  He was trying to scare the officers off. He did not aim at any officers at any time that day. Higdon Dep. at 89:16–91:5. Careful review of the video evidence confirms that Higdon didn't fire through the glass door and break the glass pane until Sgt. Tyner and Officer Reece were both off of the porch and on the ground and not in that line of fire. *See, e.g.*, Video Exs. 12, 13 and 22.

**David and Vickie Seek Shelter in their Bedroom During Shooting.**

David Wright then took Vickie into our bedroom and they huddled down next to the bench beside their bed. After that, Vickie could hear shots from the back of the house, which she believed Daryl was firing, and other shots from the side and front of their home. V. Wright Decl., Ex. 6 ¶ 11.

**K-9 Appears to be Injured by Accidental Discharge by Law Enforcement.**

About this same time, as one of the officers is running towards a position of cover, an officer who is running with his pistol in his hand trips and falls, at which time a muffled gunshot is heard while the officer appears to have fallen onto his body camera, immediately followed by the sound of a dog yelp. Higdon is still inside the house at this time and not in a position to have fired a shot that struck the K-9 and does not appear to have been firing a shot at that time. A reasonable inference is this is when K-9 Hank is injured. Video Ex. 9.

**Higdon Goes to the Back Deck, Shoots in Air, to the Side, and From the Corner and Officers Return Fire.**

After Higdon fired shots towards the floor and into the lower wall of the foyer and additional shots through the doorway after the officers were off of the porch, Higdon retreated to

---

[10] Defects in the foyer wall consistent with Higdon's shots away from Sgt. Tyner were documented by Plaintiff's expert Gary Shaffer.

the back of the house and went out on the back deck. Higdon Dep. at 57:3–9. When Higdon first went out on the back deck, he shot into the air. He recalled shooting, sometimes just to make noise, trying to scare them off, hoping to get off the back deck and get away. *Id*. at 95:8–19. After Higdon fired the initial shots out the front door, all of the rest of the shots were fired when he was out on the back deck in the back of the house. *Id*. at 91:15–92:5. It was when Higdon was initially firing that he looked out towards the front of the house to see what was going on, and then he went to the back deck. After he went to the back deck, he never fired any more shots out of the front of the house. He just fired those shots from the back deck, and fired some into the air, some just out to the side, and some from the corner. *Id*. at 99:11–100:24. When Higdon shot from the corner, he shot in the general direction of the officers, but not at any of them – just to the side. *Id*. at 100:18–101:6. Higdon was expecting to get shot by the officers and figured it was going to be his "last day on earth." *Id*. at 101:7–13.

This sequence of events may be seen on Video Exs. 10, 11, 12, and 22.

**Higdon is Wounded, Puts his Gun Down, and Stops Shooting.**

When Higdon agreed with defense counsel during his deposition questioning that he wanted to go down fighting, he meant that he thought they would shoot at him – his preference was to get shot rather than to go back to prison. He was not trying to hurt any officer that day. *Id*. at 91:6–14.

After Higdon had been shot four or five times and put his gun down on the back deck, he never went back to the corner of the house anymore. *Id*. at 111:3–9.

After Higdon got shot four or five times, he decided to stop shooting and sat down on the back deck away from the corner and put his gun down. After that, he did not shoot any longer. He

18

sat for a while trying to figure out what to do, but by that point had decided not to shoot anymore. *Id*. at 96:20–97:25.

**Officers Fire Thirty-Six Shots into the East Side of the Wrights' Home Near the Wrights' Bedroom, Nineteen Times *After* Higdon Stops Shooting, Has Retreated, is Wounded, and is at a Location Not Visible to the Officers.**

With the exception of Officer Paul, the other officers who fired toward the southeast corner and east side of the Wrights' home were unable to see the back deck and the stairs to the back deck, excepting only a few of the lower steps, both because of the angle to the southeast corner of the home, and also because of the large tree between that corner of the Wrights' home and where the officers were located. *See, e.g.,* Ex. 13, 14, 15.

There were a total of thirty-six (36) bullet holes in the east side of the home. Shaffer Decl., Ex. 5 B, Report at 12. *See also* Ex. 9; Twelve (12) of those rounds entered the closet on the other side of the east wall. Ex. 5 B, Shaffer Report at 12. Twelve (12) of those rounds entered the bedroom on the other side of the closet and were found in the bureau. Id. This bedroom is where Vickie and David took refuge during the gunfire. *Id.;* Vickie Wright Decl., Ex. 6 ¶ 11.

Some bullet holes were up to twelve feet from the corner of the home where Daryl initially fired from. Ex. 5 B, Shaffer Report at 12.

On close inspection, the bullet holes appeared to come from either 9mm or .223 caliber rounds. *Id*. Only Officers Paul and Verez fired 9mm pistols. *Id*. Only Dep. Hunter fired a .223 caliber rifle towards the home. *Id.*

Video evidence confirms Higdon's last shot at approximately 3:46 on the counter on the Eller composite videos (*see* Eller Decl., Ex. 1, 1B) ("Eller counter"); Exs. 12, 24. *See also* Shaffer Rebuttal Report, Ex. 5 C; Pleasants Rebuttal Report, Ex. 4 C.

19

Video evidence confirms that Officer Verez fired approximately 10 rounds from his 9mm pistol at approximately 4:07 -4:11 on the Eller counter – about 21 seconds after Higdon had stopped shooting, was wounded, and had moved to the middle of the back deck, well out of sight of the officers. *See also* Exs. 12, 24; Video Exs. 14, 15.

Similarly, video evidence confirms that Deputy Hunter fired five times with his rifle several seconds after Higdon had fired his last shot, had moved back, and was no longer visible. Then, after saying " "Where's he at?" he fired four more times approximately thirty seconds after Higdon's last shot – about 4:14 - 4:16 on the Eller counter – again, at a time when Higdon was not visible to Hunter. *See also* Exs. 12, 24; Video Ex. 16.

After Higdon stopped firing, Verez's continued shooting is based on where he had seen muzzle flashes previously. *See id*. at 180:11–181:22. Consistent with Officer Verez not having a target and not being able to see where he was shooting at the time he fired the ten shots referenced above, he testified that he had no idea where any of his ten shots went. Verez Dep. at 153:4-12.

From the referenced video evidence, the total number of shots fired by law enforcement was less than 45.[11] Accordingly, with 36 shots being fired into the east side of the Wrights' home, *more than seventy-five percent* (75%) of the shots fired by law enforcement that evening *were fired into the east side of the Wrights' home* and *nearly half* (20) were fired after Higdon had stopped shooting, was wounded, and had moved to a location on the back deck where he could not be seen by any of the officers.

---

[11]SCSO and SPD written policies require use of force reports to be prepared by officers for each use of force – to account for each bullet discharged. Yet not only were use of force reports not completed by these officers to account for the number of times their weapons were fired, much less other information pertaining to each shot, but in SPD's "2023 Force Response Review" detailing the uses of force for the entire year, the number of "Firearm Discharges" for the year by SPD Officers is listed as "0." See the SPD "2023 Force Response Review," attached as **Ex. B**.

20

**After Officers Stopped Shooting into their Home Near Their Bedroom and It Got Quiet, David and Vickie Wright Seek Safer Location and Move To Their Front Door**

After the shooting stopped and it got quiet, David took Vickie's hand and said that they needed to get to a safer place. They got up, he opened the bedroom door, and he led them out towards the front door with Vickie close behind him and holding onto his waist. V. Wright Decl., Ex. 6.

**Daryl is Wounded, Tries to Come in the Back Door; David and Vickie Tell Him to Go Back Out (and He Does).**

Vickie recalls that when she and David got outside their bedroom, they looked toward the back door that goes from the living room to the back deck and noticed Higdon opening the door and briefly trying to come in the back door. She recalls that they yelled for him to get out and that he turned and went back out. She did not see a gun. A little later, when they got towards the front door, Higdon tried to come in a second time. They again yelled for him to get back out. At that time, Vickie noticed that Higdon was wounded. She could see blood around his stomach. He said he had been "hit." She did not see a gun. They yelled at him to get out several times and he did. V. Wright Decl., Ex. 6.

Higdon testified that he recalled trying to go back into the house and then David yelling at him to get out, so he went back out on the deck. Before he went into the house briefly when David instructed him to go back out, Higdon had already put his gun down on the deck and left it there – he didn't have his gun with him when he stepped back inside briefly. Higdon Dep. at 96:24 - 98:21.

Higdon also recalls that after he had been shot four or five times and had put his gun down, he saw additional officers coming to the scene from behind the Wrights' house. There were many

21

of them. He could see officers on foot on either side of the house and behind the property while he was still on the back deck. None of them shot at him. *Id*. at 109:11–110:15.

**Vickie Appears at the Front Door for Several Seconds.**

Video evidence confirms that at this time, Vickie appears in the front doorway for several seconds. *See, e.g.,* Video Ex. 18; see also Video Ex. 13. None of the officers comment or communicate about her being at the front doorway. None of the officers calls out to her. None of the officers shoot at or towards her. *Id.*[12]

**David Appears at the Front Door for Several Seconds, Talks with Sgt. Tyner, Who Tells Him to "Come Out"**

Video evidence likewise confirms that a short time later, David appears in the front doorway for several seconds. Vickie recalls that David wanted her to be behind her and recalls that she was behind him while he was looking out and preparing to lead them outside. V. Wright Decl., Ex. 6. See also Video Ex. 19; Video Ex. 13. David was very different in build, appearance and clothing from Higdon, as noted previously. Higdon identified a picture of David Wright in the front doorway of his home and agreed that's what David was wearing the date of these events. Higdon deposition, 114:1–20, Ex. 10.

Video evidence likewise confirms that as David looks out the front door, Sgt. Tyner seems to recognize David from their previous interaction and asked David "where's he at" and instructs him to "come out."  David responds:  "he's on the back porch." Video Ex. 9, 13, 22 and 23.

---

[12] In her Declaration, Vickie states that she understands there is a video of her appearing in the front doorway for some time prior to David getting to the front doorway. She recalls wearing a bright blue T-shirt and white shorts that evening. Although she doesn't recall being in the front doorway, she doesn't dispute that she was given the video shows. Understandably, she has not wanted to watch any of the videos of the events. V. Wright Decl., Ex. 6.

22

**David and Vickie Wright are Shot by Officer Hunter at the Front Door, Unarmed and While They Were Following Another Officers' Instructions to Come Out.**

Video evidence also confirms that just a moment after Sgt. Tyner engages with David and instructs him to "come out," David is shot in the head and killed by Deputy Hunter and Vickie is struck with multiple shards of the bullet that killed David. Video Ex. 19, 13; Ex. 12; *see also* the Declaration of Dr. Thomas Owens, Ex. B (summarizing the video and forensic evidence that David was shot and killed by Deputy Hunter). Video evidence likewise confirms that neither David nor Vickie had a weapon or anything in their hands. Video evidence confirms that neither was a threat. Video evidence confirms that David was providing helpful information to Sgt. Tyner when he was shot and Vickie was struck with bullet fragments.

Vickie Wright also confirmed that neither was armed and they were just trying to get to a safer location. V. Wright Decl. Ex. 6.

David Wright and Daryl Higdon's physical build and characteristics are very different. David was short, stocky, had white hair, was balding, and was wearing a light colored t-shirt. Ex. 7 (screen shot of David from Tyner's body cam). Higdon was taller, skinny, wearing a black shirt, wore a durag, and had a goatee. Hunter, in fact, was one of the officers who had briefly seen Higdon on the back porch of the Wrights' home as he first was walking towards the back door at the outset of these events. Video Exs. 5, 22.

Video evidence also confirms that Higdon's last shot had been fired *more than two minutes earlier*. *See* Video Ex. 13; *see also* Shaffer Rebuttal Report, Ex. 5 C (the initial time between Sgt. Tyner's first shot and Higdon's last shot was 2 minutes and 7 seconds; the time between Higdon's last shot and Hunter's shot that killed David and struck Vickie was 2 minutes and 10 seconds. The gap in time since Higdon's last shot was more than the total time of the (sporadic) gunfire

23

beforehand. Accordingly, objectively and factually, Hunter's shot cannot be fairly described as having occurred during an "exchange of gunfire." Ex. 5 C, Shaffer Rebuttal Report.

Detective Jerry Vandergriff, who investigated the criminal charges against Higdon following these events and is a Firearms Instructor for SCSO, testified that according to the video evidence, neither David Wright nor Vickie Wright posed a threat to any officer at any time and David did not have anything in his hands at any time. Vandergriff dep. at 74:10 – 75:6; 75:23 - 76:3.

Deputy Hunter testified that when he first saw the individual he shot, he "could barely see him"; he could only tell that he was "white," the only body part he could see was his head, he couldn't tell if he was balding; he couldn't tell what he was wearing; and although he said he thought he saw a "gun," he couldn't tell what hand it was in or where it was pointed. Hunter Dep. at 141:25 - 145:17. Hunter said that he had not seen the person shoot a weapon at any time previously. 146:6-10. He acknowledged that Sgt. Tyner and Officer Reece were closer to the person than he was and that neither of them radioed or called out to say that the person at the door had a gun. 148:1-12. Hunter was using a red dot scope, had the red dot on the person's head, and immediately after Officer Hunter fired the shot at the person's head, he didn't see the person anymore. 151:12-19.

Vickie states that there are some details and things she may not recall or have blocked out. She tries not to think about specifics around the time David was shot. She does remember there being one gunshot as David was starting to lead her out the front doorway and open the storm door and, as she testified in her deposition, that the shot came from the front of the house, though she's not sure where in front. V. Wright Decl., Ex. 6. She states that David did not have anything in his hands and did not have a weapon of any kind at any time during these events (and she didn't

24

either). *Id.* She also recalls that when David was shot, she was immediately behind him – a matter of a few inches – and was still touching him. She felt percussion in my face from the shot. She recalls feeling like she was unable to keep David from falling to the foyer floor and feeling helpless and that she did not know what to do. She remembers seeing a pool of blood around David's head and then going into the kitchen and praying to summon the courage to go out the front door, even though she was worried she might get shot as well. *Id.* Vickie states that when she went back into the foyer from the kitchen, Daryl had not tried to come back in the house and that her recollection is the back door was still closed. She did not see him. *Id.*

After listening to her TBI interview, which was about three hours after David was shot, she states that she was doing her best to answer the questions and also was trying to figure out what had happened. After explaining that there had been shots fired from the back of the house while they were in the bedroom, before it got quiet and David wanted them to move and go out the front door, and after explaining that David was in front when he got shot and she was right behind him, she then was explaining to the interviewer when David was shot when he reached for the storm door knob, and then she paused briefly to ask the interviewer: "there were gunshots from the back deck – would that have given someone a reason to shoot him (David) – because they couldn't tell from what direction the gunshots were coming from?" The interviewer answered: "I don't know." Accordingly, she was not trying to say that the gunshot that killed David was from the back or that there were gunshots from the back when David was shot. She was asking whether the fact that Higdon had been shooting from the back of the house previously would have given someone a reason to shoot David as they were trying to come out the front. *Id.*

25

Photographs taken by the TBI documented the numerous injuries Vickie had from the sharp pieces of bullet fragments that struck her in the face and upper body from the bullet that struck David's head. Ex. 12.

Dr. Paul Miller reviewed the facts and record pertinent to his inquiry into the medical impact of these events on Vickie and has confirmed his determinations in his written report. He concludes that Vickie does suffer from post-traumatic stress disorder from these events. *See* Miller Declaration and Report (proposed as filed under seal).

**Vickie is Handcuffed and Left in Back of Cruiser for an Hour and a Half without Medical Attention or Assistance.**

Vickie recalls that when she ultimately went outside after David was shot, one or more of the officers instructed her to walk towards them. When she got to where the officers were, she told them that someone killed her husband. One asked who was the one who was shooting at them and she told them that it was her brother. One asked if her brother was inside and she told him that he was on the back porch. She told them her brother had been shot and that he was bleeding in the stomach area. She told them she had no weapons and asked why she was being handcuffed. They handcuffed her behind her back anyway and put her in the back of a police cruiser. Vickie also states that when the officer handcuffed her and put her in the back of the police cruiser, she was still in shock and was having a hard time processing what was happening. She was not trying to leave and was cooperating with them and was not threatening anyone. V. Wright Decl., Ex. 6.

Vickie was left in the car for approximately an hour and a half. No one came to check on her until she eventually started making noise as best as she could to get someone's attention so that she could ask for some items, including her medication.

26

Eventually, someone from the TBI came and took her to a different car. She was then driven to give a statement which started that same evening and lasted for approximately an hour and a half. *Id.*

That night, Teresa Ramsey recalls arriving near her mother's house when a car was leaving with her mother in it with someone she believes wise with TBI. She recalls having an opportunity to speak with her mother, and was trying to clean the blood off of her and out of her hair. She asked the officers that were with her if she could take her and clean her up and they said no. Teresa Ramsey recalls that her mother was wounded on her face and she was trying to clean the blood off her face and things out of her hair. Teresa Ramsey Dep., 27:13–30:7.

When Higdon eventually walked from the back deck to the front door to surrender to the officers, they did not shoot at him. He was still wearing a black shirt and a do-rag. Higdon Dep. at 104:23–105:7.

Morgan Watts, one of the City's 30(b)(6) designees, testified that he understands Vickie was in car in cuffs for about 91 minutes. City Dep. at 50:17. He stated that he didn't think the length of time was unreasonable. *Id.* at 53:22-23.

Deputy Hunter is the officer who handcuffed Vickie, put her in the back of the cruiser, and left her there. Video Ex. 22. He believed Vickie needed to be in handcuffs, or at least watched, until SORT cleared the residence. Hunter Dep. at 219:19–220:7.

**Officer Hunter Misrepresents Facts After Shooting**

When Vickie first walks out of her home after David is shot by Dep. Hunter, Dep. Hunter instructs her to walk towards him with her hands up and questions her about who had been shooting at the officers. Vickie responds, "my brother." Vickie also states that "someone killed my husband." She also tells Dep. Hunter and the other officers close by that her brother has been shot

27

and is on the back deck. Video Ex. 12, 22. Subsequently, though, when Hunter is talking only with other officers, he claims that Vickie told him that there were "two shooters." *Id.*

When later questioned about the misstatements he ascribes to Vickie, he agrees based on watching the video footage that Vickie never said anything to suggest two shooters. Hunter Dep. at 212:24 – 213:8.

Chief Carr, when questioned similarly, acknowledged that Vickie told Dep. Hunter that her brother had been shooting, and had never mentioned anyone else. Carr acknowledged that later, Dep. Hunter claimed to other officers that Vickie had said there were two shooters. Carr Dep. at 57:9 – 58:7. Carr did not know of anyone who had confronted Hunter about why he claimed Vickie had reported that there were two shooters when she didn't. *Id.* at 58:8–14. Carr also acknowledged that David does not appear threatening in any manner, and that one cannot see anything in his hands. *Id.* at 70:10–22. Finally, Carr acknowledges that that Dep. Hunter's attorney asked for a break during Hunter's *Garrity* interview and that before the break, Dep. Hunter had only mentioned seeing "something" in David's hand, but that after the break, Hunter stated that the object he saw was a gun. *Id.* at 56:18–2.

During Sgt. Rademacher's testimony, he acknowledges that Dep. Hunter said something about someone at the front door with a gun after firing his rifle. Rademacher Dep. at 112:24–113:5. Rademacher never saw anyone at the front door with a gun. *Id.* at 113:6–9. He also acknowledged that Dep. Hunter told him there were two shooters. *Id.* 131:3–7, but he doesn't know what Hunter was talking about and acknowledges that Vickie did not say that. *Id.* 131:8 – 14. He doesn't know why Dep. Hunter would have said there were two shooters. *Id.* at 131:25–132:15.

Vickie stated what the video footage confirms: that she never told any of the officers or anyone else that there were two shooters. There were not two shooters (excluding the officers). She states she told them it was just her brother who had been shooting. V. Wright Decl., Ex. 6.

When Sheriff Hodges was asked whether there was any video evidence or any other evidence of any kind to suggest that there were two shooters, Sheriff Hodges answered "No, sir, none whatsoever." Hodges Dep. at 60:21-25. Sheriff Hodges also acknowledged that Dep. Hunter would have seen Higdon's physical appearance and clothing from the start, which was very different to David Wright's. *Id.* at 70:8–25.

Dep. Hunter has since been terminated from SCSO for an issue unrelated to the events that are the subject of this case. The parties disagree on whether the issue that resulted in Hunter's termination involves a matter of dishonesty. County 30(b)(6) (Hodges) 109:4-110:23.

**The Officers and Departments Confirm that Their Conduct Followed Their Customs, Policies and Training.**

Regarding whether the County has a custom or practice day-to-day that is unlawful, aside from its written policies, Sheriff Hodges testified that: a "knock -and-talk authorized them to go up, contact the suspect, and arrest the suspect, Hodges Dep. at 49:9–20; officers are allowed to approach guns drawn and surround the house without a warrant. *Id.* at 188:9-14. Testifying as the County's 30(b)(6) designee, Sheriff Hodges stated that Sergeant Tyner's and Deputy Hunter's actions and conduct during the subject events were at all times consistent with the policies, practices, customs, and training of the Sevier County Sheriff's Office. County Dep. at 107:2-8. Similarly, when asked "When Deputy Hunter fired the last shot that killed David Wright, was Deputy Hunter following the practices, customs, and training of the sheriff's office?" Sheriff Hodges responded: "I believe so, yes." *Id*. at 141:9-13.

29

Deputy Hunter testified that the type of (warrantless) "knock and talk" they carried out in this case was consistent with training. Hunter Dep. at 163:9–17. Hunter also testified that it was appropriate to be on the back deck, weapons drawn, making those announcements to come out, *id.* at 62:14–19; that it's consistent with training to announce presence, tell suspect to open up or they're coming in*, id*. at 59:6–17; that he was following his training when shooting through the tree, id. at 175:13–18; that the shots fired at the Wright's house while Higdon was upstairs (out of view on the deck) or inside the house were within his training, id. at 183:6–184:7; that he was following his training when he shot David Wright, id. at 155:10–22; and that he doesn't recall any action by any officer during the subject events that was contrary to training, id. at 236:5–19.

Officer Verez stated that "[w]e use tactics sometimes to say things that kind of trick them to come out, and sometimes by you telling somebody, either you come out now or we're going to come in, a majority of the times they just come out and it's a lot less of a headache" id. at 96:3-8. Verez affirmed that everyone's conduct during the subject events was consistent with SPD training. *Id.* at 33:17-35:3.

Officer Paul testified that he was following his training when giving commands on the back porch, Paul Dep. at 34:1-4.

Sgt. Rademacher testified that all actions leading up to his giving the command to come out were consistent with SPD training, Rademacher Dep. at 171:17–23, and that he cannot identify any actions he took that would be contrary to SPD training, *id*. at 172:3–6.

Chief Manning testified that unholstering firearms after seeing Higdon retreat back inside, and making the commands to exit by threatening forcible entry were both consistent with SPD training. Manning Dep. at 54:4–13. He stated that all SPD officers received exceptional valor awards for the call at the Wrights' home, *id*. at 36:2–17, and that none have received any sort of

discipline, *id*. at 35:23–36:1. Based on the material reviewed up to the point of the depo, Chief Manning has not seen any act or omission of any officer that concerns him or he believes warrants further investigation. *Id.* at 61:7–15.

Chief Carr, as the County's 30(b)(6) designee, testified that both Dep. Hunter and Sgt. Tyner were following SO training throughout this incident. County Dep. at 71:15–72:11. Carr's recommendation was for officers to return to full duty because there was no violation of any SO general order and he maintained that opinion at the time of the deposition. *Id.* at 72:12–73:5.

Sgt. Tyner testified that an officer's declaration that someone open the door or they're coming in (in a situation like this one) would be consistent with his training with Sevier County. Tyner dep. at 151:10-13, as would approaching the back of the house with service weapons drawn, *id.* at 94:12-16. Tyner says that he was following his training when firing the first two shots into the corner of the wall. *Id.* at 105:7-10. He also testified that "it is a common practice to use a good bluff to see if somebody will surrender themselves peaceably without it leading to stuff like that. […] sometimes you'll threaten to do that as a bluff to get somebody to open the door? I have before, yes." *Id*. at 179:22-180:5. He affirmed that it is important to be courteous and not threatening in a knock and talk, *id*. at 68:15-22.

**Minimal Investigation Was Done of the Officers' Seizures or Uses of Force, Reinforcing the Affirmative Testimony that the Officers' Seizures and Uses of Force Were Consistent with the City's and the County's Customs, Practices and Training.**

Officer Paul was never asked to fill out a report and was never interviewed by SPD about the incident. Paul Dep. at 124:18-126:10.

Deputy Hunter has served as an FTO (Field Training Officer). Hunter dep. a 66:15–17.

Sheriff Hodges acknowledged that Policy is to complete use of force report after any law enforcement officer fires a weapon; it's important for ensuring compliance with policy and legal standards. Hodges dep. at 29:4–30:4. Use of force reports are also important for reporting to TIBRS

31

and TBI. *Id.* at 83:1–4. No use of force reports were completed here, although an internal affairs report was by Chief Carr, which Sheriff Hodges said documented some of the information that would have been included. *Id.* at 82:8–22. Hodges acknowledged that the presence of FTOs specifically, and sergeants inherently, informs junior ranks what to do or not do, how things are done, *id*. at 69:16–70:7, and said the Sheriff relies on FTOs and sergeants to ensure written policies are implemented to the actual practices and customs in the field. *Id*. at 112:25–113:11.

Chief Carr, as the County's 30(b)(6) designee, testified that in determining who shot, at what, and target background, SCSO internal affairs relied only on deputies' body cameras, *id*. at 29:7–30:25. He reviewed SCSO General Orders containing force restrictions where there's risk to bystanders. Officers should be aware of field of fire, including backdrop, to avoid risk to innocent persons. Prohibited when shooting into a building or through a wall where subject isn't clearly identified, and where its unknown if other occupants present. Effective as of 8.28.2020. County Dep. at 81:6–82:8. Another General Order contains force restrictions and says officer will no use deadly force where death or injury may result to any innocent person, or when the person to be fired on is not clearly visible. Revised date of 05.20.2020. *Id*. at 82:9–32:2.

Det. Vandergriff testified that the scope of his investigation was handling the state charge of Higdon's conduct, and nothing else. Vandergriff Dep. at 38:18–25. Det. Vandergriff was unaware at time of deposition who fired the shots into the side of the house; nobody from the SCSO investigated who fired those shots. *Id*. at 43:10–15. He never went back to the scene to rework or analyze anything after TBI left. *Id*. 44:5–11. He synced the across the street neighbor's surveillance camera with the body cams and determined within a couple of days that Hunter had shot David. *Id*. at 48:19–48:11. Det. Vandergriff did not attempt to sync the real-time of anything depicted on the school surveillance camera looking at the back of the house. He did not attempt to

32

determine where Higdon was located at the points where officers fired shots. *Id.* at 48:21–50:1. He does not know of anyone who determined how K-9 Hank was shot; he could not determine whether Ofc. Paul's pistol discharged when he fell, *id.* at 108:1–5, and has no information regarding whether the reference to shrapnel in Ofc. Paul's medical records is connected to the discharge of his pistol, *id.* at 108:6–10.

Dylan Reid, case agent for the TBI, made no effort to enhance the New Center School videos. Reid dep. at 56:18. He categorized the bullet holes on left (east) side of the Wrights' house as defects, *id.* at 38:7-18, but no effort was made to ascertain the number and location of these defects, *id*. at 41:13-17. He agreed that it is important to know who is on the other side of the wall when firing shots at east wall of Wright residence. *Id.* at 41:24-42:11. The scope of his investigation was to prepare a case file for the Sevier County Attorney General's Office for the purposes of allowing the Sevier County DA's office to make an assessment whether any criminal charges should be brought; "the TBI's called in to investigate criminal matters, not civil matters." *Id*. at 106:3-19.

Morgan Watts, as one of the City's 30(b)(6) designees, testified that he did not know of or create any synced videos. p.34:17-21. He also did not know where Verez or Paul's shots went. p. 33:22-34:10.

Hinson, another of the City's 30(b)(6) designees, when asked whether the City reviewed the subject incident, said that they did, but deferred the "formal" investigation to the TBI, as their review did not find any deviation from SPD policy on the part of the SPD officers. "I don't recall any violations. When I said that required action, I guess any – if we saw problem, we would have addressed it. There wasn't a policy violation, that I recall." City dep. at 41:12-42:1. All shots fired by Verez complied with SPD training. *Id*. at 43:20-24. The City's review determined that

33

Rademacher and Reece followed SPD custom, practice, and training at all times during the subject events. *Id*. at 79:9-18. There was no syncing of video in this case and it is generally not needed in other cases. *Id.* at 80:7-81:4.

Although the City represented that it reviewed the subject events and found no violations by any officers, the uses of force during the subject incident by City officers did not result in any reports being prepared. In fact, despite the large number of rounds fired by City officers at the Wrights' home on May 12, 2023, the City's "2023 Force Response Review" reports "0" uses of force during the calendar year 2023. *See* the referenced report, attached as **Ex. B**.

<u>**Defendants' Summary Judgment Motions**</u>

Against this factual backdrop, Defendants' motions rely on a transparently selective account of the subject events that distorts the record. Several critical facts and events have been omitted as if they never happened. For example, in the opening paragraphs and throughout the 47-page brief filed by the City and its four officers involved in the Joint Operation, there's no mention of the City and County Officers' casual violation of the Fourth Amendment by following their routine custom and practice surrounding the Wrights' home without a warrant, some with guns drawn, deploying K-9's both on the front porch and back porch as a matter of common practice, and threatening forcible entry through the front and back doors if they weren't allowed in—all instinctively following their departments' common approach based on its training, customs and practices at the time.

Similarly, there's no mention anywhere in their briefing that law enforcement started the shooting by firing at Higdon shortly after the officers had seized the occupants of the Wrights' home unlawfully and while Higdon was in a defensive position near the foyer with a gun pointed toward the ceiling. Defendants also completely fail to mention that officers involved in the Joint

Operation—both from the City and the County—fired their weapons numerous times into the east side of the Wright's home after Higdon had stopped shooting, had been seriously wounded, had put his gun down, and, as video evidence confirms, had moved to a location where he was not visible to any of the officers.

Defendants also completely omit what video evidence confirms -- that when David Wright was shot in the head and killed and Vickie Wright was struck in the face multiple times by shards of shrapnel fired by law enforcement (Deputy Hunter) during the Joint Operation, it was *more than two minutes* after Higdon had stopped shooting, had been wounded, had put his gun down, and, objectively, the only threat during that time period of the Joint Operation had been the numerous indiscriminate, blind shots fired into the east side of the Wrights' home by law enforcement.[13]

Perhaps worst of all, Defendants' briefing suggests that David Wright was shot and killed "during the exchange of gunfire" between the officers and Higdon. [Doc. 111 at 2]. Fortunately, the subject events were preserved on two surveillance cameras in addition to the officer' body worn cameras. An objective review of the video evidence confirms that Defendants' position that Mr. Wright was shot during an "exchange of gunfire" are not only misleading, but false. *See, e.g.,* Video Ex. 19 at 05:56; *see also* the Declaration and Reports of Gary Shaffer, Ex. 5.

Fairly and objectively considered, not only are Defendants' motions meritless, but the Court may exercise its discretion to grant Plaintiff Vickie Wright a summary judgment on some issues pursuant to Fed. R. Civ. P. 56(f). For similar reasons, given that several facts and elements of Plaintiff's claims are beyond dispute, the Court may find certain matters established in this case pursuant to Fed. R. Civ. P. 56(g).

---

[13] In addition to leaving out critical parts of the events, Defendants purport to rely on information that is clearly irrelevant or inadmissible, as is discussed *infra* in point VII.

**Standard of Review**

"A summary judgment movant bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *See Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986). Summary judgment can be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitle to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). When the defendant moves for summary judgment, "if a reasonable jury could find for [the plaintiff], a genuine dispute of material fact exists, and summary judgment is not appropriate." *Doe v. Univ. of Ky.*, 111 F.4th 705, 715 (6th Cir. 2024).

In Section 1983 cases where defendants assert qualified immunity, when facts material to whether an officer's actions were objectively reasonable are disputed, summary judgment is inappropriate. *See Knowlton v. Richland Cnty., Ohio*, 726 F. App'x 324, 331–32 (6th Cir. 2018) ("In light of the competing inferences one might draw from these facts and their effect on the question of whether [the officer's] actions were objectively unreasonable, we agree with the district court that the jury should find the facts that determine whether [the officer] is entitled to qualified immunity.") (quoting *Jefferson v. Lewis*, 594 F.3d 454, 463 (6th Cir. 2010)). Although the reasonableness of officer conduct from the perspective of a reasonable officer, the facts must still be construed in the light most favorable to the nonmoving plaintiff; the reasonable officer analysis does not mean courts "accept the officers' subjective view of the facts." *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019).

36

<u>**Plaintiff's Pending Motion to Amend**</u>

Mrs. Wright's timely motion to amend, [Doc. 107], is fully briefed and pending. The proposed amendment clarifies her theories and claims, adds factual detail, and conforms the claims to the evidence developed in discovery. For example, a theory of seizure based on how the officers approached and surrounded the Wrights' home is not explicitly mentioned in Counts I and II of the original complaint, but it is in the relevant counts of the proposed amendment. *See*, *e.g.*, [Doc. 107-1] ¶¶ 39-49, 203-204. The proposed amendment also provides more factual detail about Mrs. Wright's *Monell* claims.

Mrs. Wright respectfully requests that the Court decide her motion to amend before deciding the summary judgment motions. "A district court abuses its discretion when it grants a motion for summary judgment without first ruling on a pending motion to file an amended complaint." *Gresh v. Waste Servs. of Am., Inc.*, 189 F. App'x 359, 360 (6th Cir. 2006) (vacating summary judgment and remanding for consideration of plaintiff's motion to amend). *See Ellison v. Ford Motor Co.,* 847 F.2d 297, 301 (6th Cir. 1988) ("[T]he court granted summary judgment for [Defendant] without indicating whether plaintiff's motion [to amend] was even considered. The . . . failure to consider and rule on plaintiff's pending motion to amend the complaint was an abuse of discretion."); *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987) ("Given the policy of liberality behind Rule 15(a), it is apparent that when a motion to amend is not even considered, much less not granted, an abuse of discretion has occurred.").

<u>Argument</u>

**I.**    **The Individual Defendants unlawfully seized David and Vickie Wright by surrounding their Home, invading their curtilage -- some with guns drawn, deploying K-9's on both the front and back porches, and threatening forcible entry without a warrant.**

    **A.**    **Unconstitutional seizure occurs if police officers surround a home without a warrant and with a show of authority that would make a reasonable person believe they were not free to leave or that they would be compelled to comply with the officers' demands.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A person is seized in violation of the Fourth Amendment if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). When an officer uses a show of authority, the individual must submit to the police officer's authority for the interaction to amount to a seizure. *See Cal. V. Hodari D.*, 499 U.S. 621, 628-29 (1991). Circumstances indicating a seizure include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

The Sixth Circuit has repeatedly held that unconstitutional seizure occurs when police officers surround a person's home without a warrant and use a "show of force and authority such that a 'reasonable person would have believed he was not free to leave'" *See United States v. Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984). This type of seizure, which is sometimes called "constructive entry," is indicated by four main circumstances or hallmarks: "(1) drawn weapons; (2) raised voices; (3) coercive demands; or (4) a large number of officers in plain sight." *See United States v. Grayer*, 232 Fed. Appx. 446, 450 (6th Cir. 2007); *see e.g., Morgan*, 743 F.2d at 1164

(concluding that the criminal defendant was placed under warrantless arrest when "nine police officers and several patrol cars approached and surrounded the Morgan residence in the dark[,] [t]he officer in charge strategically positioned his car in the driveway in front of the [defendant's] home blocking any movement of his car[,] [and then] called for [the defendant] to come out of the house); *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) (holding that the officers' conduct outside of Defendant's home was a warrantless in-home arrest where police officers "positioned themselves in front of the only exit from Defendant's apartment with their guns drawn[,] . . . knocked forcefully on the door[,] . . . announced that they were the police[,]" and instructing the defendant to come outside when he opened the door). Police officers are permitted to knock on the front door of a home to speak with the occupant, but such interactions become unconstitutional if they evolve into a constructive entry. *Id.*

"Absent exigent circumstances," police officers cannot enter or constructively enter a home "without a warrant" to make an arrest, including for a violent felony. *See Payton v. New York*, 445 U.S. 573, 576, 590 (1984) (concluding that the warrantless search of murder suspect's apartment and the warrantless arrest of an armed robbery suspect in his apartment both violated the Fourth Amendment). If police officers have time between their first contact with a suspect to meet up, "assess the situation," and wait for other officers to arrive, such facts indicate that "officers are not responding to an emergency," and "that [the] officers did not feel an 'urgent need for immediate action.'" *Morgan*, 743 F.2d at 1161-62 (holding that none of the traditional exceptions justifying the absence of a warrant were present and that the officers at issue "were not in hot pursuit of a fleeing suspect").

39

**B.** **Defendants unreasonably seized the Wrights through a warrantless and unjustified constructive entry of their home.**

The evidence supports a reasonable finding that the way the officers approached the Wrights' home was objectively unreasonable. As Sgt. Rademacher acknowledged during his deposition, there were no exigent circumstances present, and they were not in hot pursuit. It is undisputed, however, that the officers did not have warrant.

The video evidence shows that the six officers involved in the Joint Operation surrounded the Wrights' home, entering the curtilage in both the front and the back.[14] The ranking SCSO officer, Sgt. Bart Tyner, and a member of the SPD special operations unit, K-9 Officer Jacob Reece, entered the front porch. The ranking SPD officer on scene, Sgt. Jacob Rademacher; an officer from SCSO, Deputy Mark Hunter; and two other members of the SPD special operations unit, Officer Nestor Verez and K-9 Officer Jordan Paul, walked up onto the back deck. Officer Reece deployed his K-9 to the front door; Officer Paul deployed his K-9 to the back door. Some of the officers had their weapons drawn as they entered the back deck and approached the back door. Sgt. Tyner then threatened to enter the Wrights' home forcibly if the front door wasn't opened. Near the same time, Officer Paul threatened to enter the Wrights' home forcibly if the back door wasn't opened. Under those circumstances, no reasonable person would have felt free to leave or free to decline the officers' demands. After the banging on the door and the threats, David Wright opened the door. This unconstitutional constructive entry set in motion the chain of events that culminated in David's death: it prompted Higdon to pull out a firearm, which led to Tyner's shots and everything that followed.

_____

[14] Video Exs. E, 4, 5, 6, 12 and 13.

**C.  The prohibition on warrantless constructive entry was clearly established before May 2023.**

A person's right to be free from a warrantless constructive entry of their home was clearly established in the Sixth Circuit decades before the events there. It was first recognized in 1984. 1984. *See Morgan*, 743 F.2d at 1164. It was reaffirmed in 2001. *Saari*, 272 F.3d at 809.

**D.  Defendants' proffered justification lacks merit.**

Defendants' motions do not seek dismissal of a seizure claim based on constructive entry. To be fair, although the way the officer approached and surrounded the house is referenced in the original complaint, *see*, *e.g.*, [Doc. 1] ¶¶ 46-54, a seizure by constructive entry is not specifically mentioned in the counts. As noted above, it is alleged in detail in Plaintiff's proposed amended complaint, and it is clearly shown by the video evidence.

Defendants' motion implicitly defends their approach and surrounding of the Wrights' home by calling it a "knock and talk."[15] A "knock and talk" is a consensual encounter occurring at "the entrance of a citizen's home;" the Sixth Circuit recognizes knock and talks as a legitimate investigative technique to confront a suspect and get more information. *See United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) (compiling cases). A "knock and talk" can become an unconstitutional constructive entry based on "the show of force exhibited by the police." *Id.* The conduct here, the jury could reasonably find, was too coercive to have ever been a legitimate "knock and talk." When the officers showed up, one or two officers did not simply go to the front

---

[15] Relying on *Sykes v. United States*, 564 U.S. 1 (2011), the City Defendants characterize "fleeing from police in a vehicle" as "a violent felony." Absent aggravating circumstances not present here, however, the relevant Tennessee statute does not have the use or attempted use of force as an element. *See* Tenn. Code Ann. Tenn. Code Ann. § 39-16-603(b)(1). *Sykes* held that felony fleeing was a "violent felony" under the "residual clause" of the ACCA, an approach that has since been found unconstitutional. *See Johnson v. United States*, 576 U.S. 591, 606 (2015). In any event, that a person may have committed a "violent felony" outside a residence is not an exception to the warrant requirement for arresting the person in the residence.

<div align="center">41</div>

door; six officers surrounded the house, with weapons drawn and K-9s in the front and back, pounded at both the back and front doors, and yelled commands like "come out or we're coming in." This approach was objectively unreasonable—as Plaintiffs' law-enforcement experts confirm. *See* Reports of Gary Shaffer; Reports of Darek Pleasants.

**II.      Several Defendants unlawfully seized David and Vickie Wright by improperly shooting into their home.**

**A.      Unless the shots are accidental, officers' shooting into a home seizes all its occupants, regardless of whether the officers know they are there.**

"[A]pprehension by the use of deadly force is a seizure." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Whether a seizure was unreasonable or excessive is determined based on an "objective" standard. Three factors that guide the evaluation are "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Eastep v. City of Nashville*, 156 F.4th 819, 828 (6th Cir. 2025). The inquiry, however, "requires analyzing the 'totality of the circumstances.'" *Barnes v. Felix*, 605 U.S. 73, 80, 145 S. Ct. 1353, 1358 (2025). That includes "all prior events, including Fourth Amendment violations." *Romero v. City of Lansing*, 159 F.4th 1002, 1009 (6th Cir. 2025). One implication of this is that "the reasonableness of an officer's use of deadly force may decline as a situation progresses." *Id*. at 1010. Put differently, a situation can become "less dangerous." *Id*. at 1012. The Sixth Circuit has "held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Eastep*, 156 F.4th at 833 (quoting *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006)).

Shooting into a house is a seizure of the people inside the house. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). "[A] seizure occurs if 'in view of all

<div align="center">42</div>

of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Campbell v. Cheatham Cty. Sheriff's Dep't*, 47 F.4th 468, 476-77 (6th Cir. 2022). "Examples of circumstances that might indicate a seizure include the threatening presence of several officers [or] the display of a weapon by an officer." *Id*. A reasonable person would not feel free to leave if bullets are being fired into their home. And the officers firing need not know how many occupants are in the home for the occupants to be seized. The Sixth Circuit has explained that, just as "when an officer seizes one person by shooting at a car . . . the officer seizes everyone in the car, even if the officer is unaware of the presence of passengers," "so does shooting into a house in a manner that prevents occupants from leaving constitutes a seizure of the occupants." *Id.* at 478. "By shooting at [a] house, [an officer] seize[s] everyone inside." *Id*.

**B.**  **A rational jury could find that law enforcement's shots into the Wrights' home were objectively unreasonable.**

The shots fired into the Wrights' home, particularly the shots fired by Tyner, and the shots fired by Verez and Hunter after Higdon was wounded, were an objectively unreasonable seizure of the Wrights. When the officers fired into the Wrights' home, they "terminated the [Wrights'] freedom of movement" and "a reasonable person would have believed that he was not free to leave." *Campbell*, 47 F.4th at 476-77 (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)). This means that "the [Wrights] were seized within the meaning of the Fourth Amendment." *Id.* at 477. And they were seized even if the officers intended to shoot Higdon, not them. *Id*.

The shots were objectively unreasonable for several reasons. First, the evidence supports a reasonable finding that Verez and Hunter fired when they had no clear target and they continued to fire continued after Higdon was wounded, had put this gun down, and had gone back into the house, i.e., when he was no longer posed an imminent threat. The video evidence and inspection and analysis of the scene by Plaintiff's expert Gary Shaffer shows the following. There were 36

43

bullet holes in the east side of the Wrights' home. Twelve of those rounds entered the closet on the other side of the east wall. Two of those 12 rounds entered the bedroom on the other side of the closet and were found in the bureau. This is the bedroom that Vickie and David Wright took refuge in during the gunfire. Some of the bullet holes were approximately 12 feet from the southeast corner of the house from where Higdon was firing. Most of the holes appeared to be 9mm and there were some that appeared to be .223 caliber. Only Paul and Verez fired 9mm pistols. Only Hunter fired a .223 caliber rifle toward the house. When Verez fired 10 rounds with his 9mm pistol and Hunter fired 9 rounds with his .223 rifle, Higdon was not shooting and was in fact not visible to the officers. He was on the upper part of the back deck or inside the house. *See* Shaffer Report at 12-13.[16]

The video evidence shows that Verez fired 10 rounds and Hunter fired 9 rounds after Higdon had moved to the upper deck and in and out of the house. When those shots were fired, "Higdon could not be seen by any of the officers from their positions of cover." Shaffer Report at 11.

Second, Verez and Hunter were shooting even though their body cameras show no threat target, no muzzle flash, and no sounds of gunfire other than their own. Shaffer Report at 20. *See also* Pleasants Rebuttal Report at 4-6 (analyzing the shots by Verez and Hunter after Higdon had stopped shooting).[17]

Third, some of the bullet holes are from six to twelve feet from the corner of the house. As Mr. Shaffer puts it, "[t]hat indicates very poor marksmanship or the officers deliberately shot into

[16] The original and rebuttal reports of Gary Shaffer are attached to the Shaffer Declaration that is Exhibit 5 to the accompanying Notice of Filing.

[17] The original and rebuttal reports of Darek Pleasants are attached to the Pleasants Declaration that is Exhibit 4 to the accompanying Notice of Filing.

a house." Shaffer Report at 21. These shots were essentially blind shots. In the opinions of Gary Shaffer and of Darek Pleasants, the shots by Verez and Hunter after Higdon stopped shooting were fell below generally accepted law enforcement standards and were objectively unreasonable. Shaffer 19-22; Pleasants Report at 10-11.

Fourth, because Mr. Wright had opened the door, at least some of the officers knew that at least one other person was in the house—and a person who was not posing a threat. *See* Video Ex. 8.

Fifth, Tyner fired when Higdon was standing in "defensive position" with gun pointed towards the ceiling and not at anyone. Hearing Tr. at 85:2-7; Higdon Dep. at 88:11-89:2. When Tyner yelled at him to put the gun down, Higdon did not put the gun down, but he did keep the barrel pointed toward the ceiling. He only lowered the gun after the officer fired at him. He never lowered the barrel from being pointed at the ceiling at any time before the officer shot at him. Higdon Dep. at 88:11–89:2. When Higdon didn't put the gun down and chambered a round, Tyner fired twice at Higdon, aiming at where he thought Higdon's "center of mass" would be on the other side of the wall. When Higdon fired, he fired his shots into the floor, on the ground. 56:19–24. Higdon returned fire into the floor or lower part of the adjacent wall so that he would miss the officer. The officer was just a few feet away and if he wanted to shoot him, he could have shot him several times. But he did not want to do that, so he shot at the wall or ground instead. He was trying to scare the officers off. He did not aim at any officers at any time that day. Higdon Dep. at 89:16–91:5. Careful review of the video evidence confirms that Higdon didn't fire through the glass door and break the glass pane until Sgt. Tyner and Officer Reece were both off the porch and on the ground and not in that line of fire. *See, e.g.*, Video Exs. 8, 12, 13 and 22.

### C. The applicable law was clearly established before May 2023.

The individual defendants are not entitled to qualified immunity for the shots that entered the Wrights' home because they had fair warning before May 2023 that shots like that would be unreasonable. For decades, Sixth Circuit caselaw has "provide[d] abundant notice that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'" *Romero*, 159 F.4th at1013 (quoting *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012)). *Campbell v. Cheatham County*—which held that shooting into a house seized all the occupants—was decided on August 29, 2022. 47 F.4th 468. And the Sixth Circuit has already held that the right to be free from the use of deadly force after a suspect has been neutralized or incapacitated was clearly established before 2023. *See Romero*, 159 F.4th at 1014. Indeed, in 2006, the Sixth Circuit noted that "[w]e have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006).

A crucial aspect of these rights is that an officer is not permitted to shoot unless he can actually "perceive" the person posing the threat. Shooting blindly into a house falls far below that standard. Defendants may dispute that they were shooting blindly, but that is fact question. The location of the bullet holes in the wall—some of which are far from the back corner—supports a reasonable inference that they were shooting blindly, i.e., that they were trying to shoot Higdon through the house. And the timing of the shots supports a reasonable inference that officers shot after Higdon had been neutralized or incapacitated. "[Defendants'] entitlement to qualified immunity for the shooting turns on the 'version of the facts' that the jury accepts, making summary judgment improper." *Gambrel v. Knox Cty.*, 25 F.4th 391, 407 (6th Cir. 2022).

### D. Defendants' arguments rest on disputed facts.

The Defendants' motions defend the shots into the house on essentially four grounds. None of them give a valid basis for summary judgment.

First, Defendants argue that the shots that went into the house did not seize the Wrights because the officers did not intend to strike the Wrights—and, for all but Tyner's shots, supposedly did not intend to shoot "into" the house at all. According to Defendants, they were only "returning fire" toward Higdon, i.e., while he was still actively shooting. This argument improperly depends on Defendants' version of the facts. As discussed above, the location of the bullet holes in the wall—some of which are far from the back corner near the deck—supports a reasonable inference that Defendants were shooting blindly, i.e., that they were trying to shoot Higdon through the house. And the timing of the officers' shots supports a reasonable inference that officers fire shots after Higdon had been neutralized or incapacitated. "Even if it was reasonable for the officers to open fire . . . that does not automatically clear the entire encounter of the constitution's prohibition against excessive use of force." *Hood v. City of Columbus*, 827 F. App'x 464, 469 (6th Cir. 2020).

Also, again, seizure can occur without a specific intent to seize the person whose movement is terminated. "[A]n 'unintended person […] [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.'" *Brendlin*, 551 U.S. at 254. None of the Defendants claims that his shots were accidental or unknowing.

Second, Defendants argue that Higdon was "attempting to shoot Tyner." City Mem. [Doc. 111] at 8. As the discussion above reflects, what Higdon was attempting to do is disputed. Also, the case Defendants rely on, *Whitehead v. Washington Cnty.*, No. 2:17-CV-153, 2019 U.S. Dist. LEXIS 168494 (E.D. Tenn. Sept. 30, 2019), is inapposite. *Whitehead* involved a factually distinct scenario where officers arrived at the scene knowing that an individual was intoxicated and armed.

*Id.* at *15. Once at the scene, the officers then witnessed the individual walking toward them with his gun in his hand, "ignoring commands to drop his weapon." *Id.* at *16. The totality of these circumstances indicated that Whitehead posed a serious theat. *Id.* at *15. Here, Daryl did not move toward Sgt. Tyner, there is no evidence that he was inebriated, and there is no evidence that the officers were aware when they arrived on the scene that Daryl was armed. Instead, Daryl was not seen holding a gun until Tyner looked in the house, and it was not pointed at Tyner. *See* Video Ex. 8.

Third, for their argument that all their shots were reasonable, Defendants rely on *Plumhoff v. Rickard*, 572 U.S. 765 (2014), and *Scott v. Harris*, 550 U.S. 372 (2007). Neither is apposite. Both these cases involved use of deadly force to stop a high-speed car chase. In *Plumhoff*, officers shot at the suspect while he was stopped in a parking lot. 572 U.S at 770. In *Scott*, an officer bumped into the rear of the suspect's car to force him off the road. 550 U.S. at 375. In both cases, however, the chase was continuing when deadly force was used. In *Scott*, the contact happened while the cars were on the road. *Id.* In *Plumhoff*, although the suspect's vehicle had stopped, "all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight, and that, if he were allowed to do so, he would once again post a deadly threat for others on the road." *Plumhoff*, 572 U.S. at 777. Defendants point to the statement in *Plumhoff* that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id*. at 777. There, however, the shots were all fired within a "10-second span." *Id*. The Supreme Court expressly noted that "this would be a different case if petitioners had initiated a second round of shots after an initial round, had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given

48

himself up." *Id*. Here, a jury could reasonably find that Higdon had been incapacitated or had put his weapon down. (On the body cam, he can be heard saying "I'm done.")

Finally, Sevier County argues that its officers cannot be found liable for excessive force because some of them did not fire any rounds, and those who did cannot be found liable for Deputy Hunter's shot that killed David Wright. Officer Tyner argues similarly. That is not the law. While mere presence, without direct responsibility, does not subject an officer to liability, direct responsibility does not require that the officer himself administer the force. *See Binay v. Bettendorf*, 601 F.3d 640, 650-51 (6th Cir. 2010).

In conducting this analysis, the manner in which each defendant violated another's rights must be addressed, *see Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002), but "it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff." *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982). Instead, "a police officer may be responsible for another officer's use of excessive force if the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Murray-Ruhl v. Passinault*, 246 Fed. Appx. 338, 347 (6th Cir. 2007). To this point, when officers have acted in concert, "[discussing] beforehand how to handle the situation and [functioning] as a unit," then it is not necessary to show that each individual defendant's actions involved excessive force. *See Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990); *see also Jackson v. Sauls*, 206 F.3d 1156, 1169 n. 17 (11th Cir. 2000) (concluding that the fact that one office did not fire his weapon did not relieve him of liability where "a jury could find that it was the concerted effort of the three Defendant officers that set off the chain of events that Plaintiffs argue" caused

the relevant deaths). The evidence discussed at length above supports a reasonable finding that this was a joint operation and the individual defendants functioned as a unit throughout the events.

**III.    As the joint operation continued, Deputy Hunter unlawfully seized and killed David Wright and struck Vickie Wright with bullet fragments while Mr. and Mrs. Wright were unarmed, not threating anyone, and cooperating with officers.**

**A.    The Fourth Amendment prohibits shooting an unarmed, non-dangerous citizen.**

"[A] police officer may not seize an unarmed, non-dangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. "As a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers." *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008). "Officers violate[] this rule when they use[] deadly force on the unreasonable belief that a suspect had a weapon." *Gambrel*, 25 F.4th at 406.

In evaluating whether a suspect poses a sufficient threat, *Garner* instructs courts to consider whether that threat is "immediate." "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "[E]ven if a person is visibly armed, lethal force may *still* be unreasonable." *Palma v. Johns*, 27 F.4th 419, 433 (6th Cir. 2022) (citing *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017)). "Whether a suspect has a weapon constitutes just one consideration in assessing totality of the circumstances." *Thomas*, 854 F.3d at 366 (citing *Perez v. Suszcynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination.")). Even "[r]acking a [firearm] inside one's home, without more, is no more threatening than coming to the door with any other loaded firearm." *Leftwich v. Driscoll*, Nos. 22-1572, 22-1575, 2023 U.S. App. LEXIS 12399, at *8–9 (6th Cir. May 19, 2023) (quoting *Knibbs v. Momphard*, 30 F.4th 200, 219 (4th Cir. 2022)).

<div align="center">50</div>

**B.    The shot that killed David was objectively unreasonable.**

When David was shot, he was unarmed, not threatening anyone, and cooperating with law enforcement. Indeed, Tyner had just been talking with him, asked him where Higdon was, and told him to come out of the house. For David to be shot dead in these circumstances is objectively unreasonable by any measure.

Hunter's motion, however, argues that he "perceived" David to have a gun. That claim is addressed further below, but Hunter's "subjective beliefs are irrelevant." *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) (citation modified). Even if he had a mistaken perception, the question would be "whether his mistaken perception and response were themselves reasonable. Plainly, not all mistakes—even honest ones—are objectively reasonable." *Floyd v. City of Detroit*, 518 F.3d 398, 408 (6th Cir. 2008). On the objective evidence, it would have been unreasonable for Hunter to believe David had a gun—and at a minimum that is a fact question that precludes summary judgment.

The evidence that makes what Hunter saw—if anything—a genuine fact question includes the following: it is undisputed that David did not, in fact, have a gun; no gun is visible on the video evidence; and the video evidence shows that, at the same time that Hunter supposedly saw a gun, Tyner was talking with David, and clearly did not think he had a gun or posed any kind of threat.

Hunter's own testimony also establishes that, whatever he thought he saw, it did not give him probable cause to identify David as posing an imminent threat. Hunter testified that he could "barely see him," i.e., the person at the door, and could not identify which hand he believed held the object. He also acknowledged that he could not determine whether the object was pointed at anyone and was unable to provide any details regarding the person's age, hair color, facial features, or clothing. (Hunter Dep. 141–144; 142–147).

51

Detective Jerry Vandergriff, who investigated the criminal charges against Higdon following these events and is a Firearms Instructor for SCSO, testified that according to the video evidence, neither David Wright nor Vickie Wright posed a threat to any officer at any time and David did not have anything in his hands at any time. Vandergriff dep. at 74:10 – 75:6; 75:23 - 76:3.

Higdon had been wounded. No shots had been fired for more than a minute and a half or two. In the opinion of both Gary Shaffer and Darek Pleasants, Hunter's shooting of David was fell below nationally recognized law enforcement standards and was objectively unreasonable. *See* Shaffer Report at 22-23; Pleasants Report at 11. A jury could reasonably find that the shot was objectively unreasonable. It also struck, and thus seized, Vickie, which means that it unreasonably seized her as well.

**C.    The applicable law was clearly established before May 2023.**

"It has been clearly established in this circuit for some time that individuals have a right not to be shot [at] unless they are perceived as posing a threat to officers or others." *Campbell*, 47 F.4th at 481 (quoting *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019)). And by 2023, it was clearly established that even if a suspect is "armed and . . . disobeyed the officers' commands, these facts do not alone amount to a threat of serious or deadly harm." *Romero*, 159 F.4th at 1013–14 (quoting *Heeter v. Bowers*, 99 F.4th 900, 915 (6th Cir. 2024)). *See also Leftwich v. Driscoll*, 2023 WL 3563207, at *11 ("[W]e have repeatedly held that when a suspect possesses a weapon but does not have it pointed at anyone, qualified immunity is generally inappropriate.").

Already in 2019, years before the shooting here, the Sixth Circuit noted that "[its] caselaw is replete with instances in which we have denied officers qualified immunity when the facts suggest—at least taking them in the light most favorable to the plaintiff—that the suspect did not

pose a serious threat to the officer." *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019). Before 2023, the Sixth Circuit had held repeatedly that "mere possession of a weapon without more is insufficient to justify deadly force." *Redrick v. City of Akron*, No. 21-3027, 2021 U.S. App. LEXIS 33892, at *12 (6th Cir. Nov. 15, 2021); *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007); *Jacobs*, 915 F.3d at 1040; *Campbell*, 47 F.4th at 480.

"And we have repeatedly held that when a suspect possesses a weapon but does not have it pointed at anyone, qualified immunity is generally inappropriate." *Leftwich v. Driscoll*, 2023 WL 3563207, at *11 (citing *Hicks v. Scott*, 958 F.3d 421, 435–36 (6th Cir. 2020)). "Therefore, it was clearly established in 2019 that an individual had the right to possess a weapon for self-defense in his own home and cannot be shot simply for possessing a weapon in a nonthreatening manner." *Id.*

The Sixth Circuit has also repeatedly held that a threat initially justifying deadly force may cease, thereby terminating the justification as well. "When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Dickerson v. McClellan*, 101 F.3d 1151, 1162 n. 9 (6th Cir. 1996) (quoting *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)).

**D. Hunter's argument depends on disputed facts and credibility.**

Hunter is not entitled to qualified immunity. Even his version of the facts would not make the shot objectively reasonable. Based on the Sixth Circuit precedent discussed above, even if he had seen a gun in David's hand, that would not have given him a reasonable basis to shoot. But his version also depends on genuinely disputed facts, not least whether he really believed the person in the doorway had a gun.

<div align="center">53</div>

In addition to the video evidence, and the fact that David did not have a gun, there is also a genuine dispute about Hunter's credibility. A jury could reasonably find that Hunter's statement on his body cam about seeing someone at the door with a gun was not simply a mistake but an attempt to begin covering up or mitigating the unconstitutional shooting he realized he had committed. He made the statement on his body camera, but it was not transmitted on his radio. The jury could find that he purposefully did not transmit the statement because it was not true and he didn't want to alarm other officers or cause them to shoot too. He may have said it just so Rademacher could hear since Rademacher obviously knew Hunter had shot. In his *Garrity* statement, he was equivocal about whether saw a weapon or not. At first, he just says he saw color. After discussion with his counsel during a break, he said that he had seen a gun.

At the scene, he also told senior officers who arrived that Vickie said there were two shooters. The video shows she never made that statement. It also shows Rademacher reacting when he hears Hunter make the claim. *See* Video Ex. 12, 22. When later questioned about the misstatements he ascribes to Vickie, Hunter agreed based on watching the video footage that Vickie never said anything to suggest two shooters. Hunter Dep. at 212:24 – 213:8.

Hunter has since been fired from SCSO for misconduct likely involving dishonesty. County 30(b)(6) (Hodges) 109:4-110:23. He was ███████████████████████████ ███████████████████████████████████████████ P. 109:4-110:23

The evidence thus supports a reasonable finding not only that it would have been unreasonable for Hunter to believe that David had a gun, but also that Hunter never actually had the belief to begin with. Credibility issues, of course, are not resolved on summary judgment.

Finally, Hunter argues that he did not seize Vickie because he did not intend to shoot her. As discussed above, that is not the test. What matters is that he intended to pull the trigger and

54

shoot David. "[A]n 'unintended person […] [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.'" *Brendlin*, 551 U.S. at 254. "[A] mere touch can be enough for a seizure," *Torres v. Madrid*, 592 U.S. 306, 317 (2021), and when the shrapnel struck Vickie, she was seized as well. *See Rodriguez v. Passinault*, 637 F.3d 675, 687 (6th Cir. 2011) (holding that officer who shot the driver of a car also a seized the passenger who was struck by "flying glass caused by the gunfire"). "When an officer intentionally shoots their firearm in circumstances that objectively manifest an intent to restrain, any individual struck by the bullet is thereby seized, regardless of whether that individual was the officer's specific intended target." *Kilnapp v. City of Cleveland, Ohio*, No. 25-3149, 2026 WL 457597, at *5 (6th Cir. Feb. 18, 2026).

**IV.     Vickie Wright was unlawfully seized when she was handcuffed and put in the back of a police cruiser.**

**A.     Investigative detentions must have a reasonable basis and last no longer than necessary.**

An investigative detention must be (1) supported by articulable suspicion, and (2) must be reasonable under the circumstances. *United States v. Ford*, No. 2:17-cr-20144-JTF, 2017 U.S. Dist. LEXIS 204083, at *5 (W.D. Tenn. Dec. 12, 2017). When detaining an individual in this manner, the detention must be temporary and last no longer than necessary, and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at *5 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Handcuffs can be used to protect officers and maintain the status quo, but they are not a de minimus intrusion. To establish that an investigatory detention using handcuffs is lawful, the government must show that "the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Valdez v. United States*, 58 F. Supp.

3d 795, 817 (W.D. Mich. 2014) (concluding that an investigatory detention was lawful where officers handcuffed an individual who had made a sudden movement but released him within thirty minutes, did not remove him from the premises, and did not place him in a patrol car).

In other words, displays of force, like using handcuffs or detention in a cruiser, must be warranted based on the circumstances. *Kowolonek v. Moore*, 463 Fed. Appx. 531, 536 (6th Cir. 2021). When "officer safety and suspect flight are of little concern, . . . handcuffing and detention are unreasonable[.]" *Id.* at 537 (concluding that it was reasonable to detain individual for five minutes who had turned his back on officers and attempted to resist the officers' attempts to handcuff him); *see Bennett v. City of Eastpointe*, 410 F.3d 810, 840 (6th Cir. 2005) (concluding that the officers' detention of children in the back of a squad car was unconstitutional because children posed no risk to the officers: they were cooperative, they did not try to run, they had already been searched, and they had been handcuffed); *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006) (concluding that the initial detention of the suspected robbers was based on a reasonable suspicion, but that it became an unlawful arrest when the police officers pointed their guns at the individuals, handcuffed them, placed them in police cruisers, and then held them there for at least nine minutes after the police knew they posed no danger).

**B.     It was unreasonable for Deputy Hunter to detain Vickie Wright by handcuffing her and placing her in a police cruiser.**

Here, when Ms. Wright exited the house after witnessing her husband being killed, Deputy Hunter pointed his rifle at her and told her to put her hands up. *See* Video Ex. 20; V. Wright Decl. ¶ 22, Ex. 6. She walked out of the house and down into the yard towards Hunter. *Id.* At that time, she was suffering from wounds in her head caused by shrapnel. *See* Ex. 11; Video Ex. 20. None of the officers provided her with any medical attention. *See* Video Ex. 20.

56

When she got to where the officers were, she told them that someone killed her husband. One asked who was the one who was shooting at them, and she told him that it was my brother. One asked if her brother was inside, and she told him that he was on the back porch. She told them her brother had been shot, and that he was bleeding in the stomach area. She told them she had no weapons and asked why she was being handcuffed. They handcuffed her behind her back and put her in the back of a police cruiser. *See* V. Wright Decl. ¶ 22, Ex. 6.

Instead, Deputy Hunter handcuffed her and placed her in the back of a police car. *Id.* Ms. Wright told Deputy Hunter that she had no weapons multiple times. *Id.* Ms. Wright was then made to sit in the back of the police car for longer than an hour, well after Deputy Hunter knew that she posed no risk and that she was unarmed. *Id.* at ¶ 25. One of the City's 30(b)(6) representatives testified that Vickie was in handcuffs in the back of the police car for 91 minutes. *See* Watts Dep. at 50:14-17. She remained in the car after Darryl Higdon was detained. *See* Video Ex. 22 at 13:20-24:00. She was cooperative, she did not try to flee, and even if it was reasonable for Hunter to initially detain her, it was not lawful for him to continue detaining her after he learned that she posed no threat. *Id.* at ¶ 24.

**C.      The applicable law was clearly established before May 2023.**

Since at least 2006, it has been clearly established in the Sixth Circuit that officers' methods and actions during investigatory detentions must be reasonable in light of the circumstances; if they are unreasonable, the investigatory detention becomes an unlawful arrest, particularly when officers place individuals in handcuffs and leave them in police cruisers for longer than necessary. *See Smoak v. Hall*, 460 F.3d at 782 (clarifying that the use of guns and handguns during the investigatory detention can be unreasonably intrusive depending on the circumstances where prior decisions had not made this clear).

**V.     The City of Sevierville and Sevier County are both liable under § 1983 claims for the conduct of their law enforcement officers because their policies caused the Wrights' rights to be violated.**

**A.     Municipalities are liable under § 1983 claims if their policies, practices, or training cause a violation of an individual's rights.**

A municipality is liable for the actions of its employees under § 1983 if its policy or custom caused a violation of the plaintiff's rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff can show a custom or policy in four ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) An "official policy" "refers to formal rules or understanding— often by not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Jackson v. City of Cleveland*, 925 F.3d at 830 ([A] city may be liable under Monell for a policy of permitting constitutional violations regardless of whether the policy is written.").

"If there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter . . . attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights." *Grandstaff v. Borger*, 767 F.2d 161, 170 (5th Cir. 1985). Although an isolated instance of police misconduct is not enough to prove a policy or the knowledge and acquiescence of a policymaker, repeated violations in the course of the same events—and the policymaker's reaction to those violations—can establish that a municipality has an unconstitutional policy or practice. *Id.* at 171. In *Grandstaff*, six police officers were involved in

the shooting of a man on his own land while the officers were in pursuit of a fleeing suspect. *Id.* at 165. The officers were initially quick to fire on the suspect prior to his flight, and they kept firing at the suspect as he hid on the decedent's land, including firing toward the decedent's house. *Id.* at 171. The officers were not reprimanded or fired, the department made "no admissions of error," and at trial, the officers testified that their policies had not changed. *Id.* Under these circumstances, the Fifth Circuit held, "[t]he jury was entitled to infer that the conduct on the [decedent's land] demonstrated the policy of the . . . city police force as approved by its policymaker, both before and after that time." *Id.* at 171-72. *See also Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[P]ost-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."); *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").

A policy of inadequate training exists where "the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury.'" *Russo v. Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992). Inadequate training can be evidenced by the inability of police personnel to explain or recall their training, even if such training exists or if there is a lack of training on specific issues. The existence of a policy, on its own, is not enough to show that officers were adequately trained. *Id.* at 1046-1048 (concluding that plaintiffs "offered sufficient evidence to raise a genuine issue of material fact as to whether the training offered by the City to its police officers on the use of force in handling mentally and emotionally disturbed individuals falls to the level of 'deliberate indifference.'"). A plaintiff can

59

show deliberate indifference to the constitutional rights of individuals with a single instance of conduct "if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (concluding that defendant was not entitled to summary judgment on plaintiff's Monell claim where plaintiff presented evidence of inadequate police training and defendant failed to provide evidence of adequate training).

**B.** **A jury could reasonably find the City of Sevierville and Sevier County liable under *Monell*.**

Vickie Wright is asserting two theories of municipal liability here: unconstitutional policy or practice; and failure to train. A reasonable jury could find for her under both theories.

The principal violations that occurred are discussed above: unlawful seizure through constructive entry; unlawful seizure through shooting into the house; unlawful seizure through the killing of David and striking with shrapnel of Vickie; and unlawful detention of Vickie. The evidence in this case is that all of those actions—from beginning to end—were done based on the policies of the City of Sevierville and Sevier County and both municipalities' policies of failing to train their officers.

For example, Deputy Hunter testified that he did not recall any discussion of a warrant, Hunter Dep. at 62:5–13; he had his gun drawn as soon as he got out of patrol vehicle and he normally does that when doing a warrant service or something like that. *Id.* at 57:16–22; he testified that he and Sgt. Tyner had served many warrants together, and they did exactly what they always do; and looking back, wouldn't change anything about approach. *Id.* at 53:21–54:24. He also testified that this type of knock-and-talk was consistent with his training, including telling individuals that if they didn't open the door, he would come inside. *Id.* at 59:6-17; 163:9-17. Hunter

60

also did not recall any action taken by an officer that was contrary to their training. *Id.* at 236:5–19.

Sgt. Tyner testified that they could do a knock and talk without a warrant. Tyner Dep. at 67:5-7. He also testified that while he did not feel he had the ability to kick somebody's door in or breach without a warrant, sometimes "you threaten to do that as a bluff" and admitted that he had done that before and that it was consistent with his training. *Id.* at 95:8-14; 180:1-5. Tyner further discussed that surrounding the home with weapons drawn was consistent with his training. *Id.* at 94:4-16. He similarly discussed that he followed his training when he fired his first two shots into the Wrights' home in the corner of the wall. *Id.* at 105:7-10.

Officer Verez similarly testified, "We use tactics sometimes to say things that kind of trick them to come out, and sometimes by you telling somebody, either you come out now or we're going to come in, a majority of the times they just come out and it's a lot less of a headache." Verez Dep. at 96:3-8. He also confirmed that everyone's conduct was consistent with SPD training. Verez Dep. at 33:17-35:3. *See also* Rademacher Dep. at 172:3-6 (could not identify any actions that he took that would be contrary to SPD training); Paul Dep. at 19:22-20:8; 34:1-4 (Officer Paul was following his training when he remained on SPD's radio channel, and he was following his training when giving commands on the back porch).

Sheriff Hodges testified that the knock-and -talk approach used by the officers was entirely consistent with their training, and that he did not observe any action from any officer that was inconsistent with the sheriff's office's training. *See* Hodges Dep. at 44:3-45:9; 119:13-22. He also testified that he believed officers are allowed to approach guns drawn and surround the house without a warrant and stated that if there's enough information to believe suspect is there, they can threaten to enter the house forcibly. Hodges Dep. at 118:9–119:12.

61

Chief Manning testified that the officers' commands to exit the home by threatening forcible entry and the officers' unholstering of their firearms after seeing Darryl Higdon retreat back inside were both consistent with SPD training. *See* Manning Dep. at 54:4-13.

During 30(b)(6) depositions, each municipal defendant admitted that the actions of their officers complied with their policies. Chief Carr, one of Sevier County's 30(b)(6) deponents stated that both Dep. Hunter and Sgt. Tyner were following their training throughout the incident. *See* Carr Dep. at 72:12-73:5. Sheriff Hodges, during his 30(b)(6) deposition on behalf of the County, similarly stated that the County's officers' actions were consistent with their training. Hodges 30(b)(6) Dep. at 76:18-77:25. Specifically, the shots fired by Hunter and Tyner were consistent with the Sheriff's Office's policies and practices. *Id.* at 104:10-17. Deputy Chief Hinson, one of the City's 30(b)(6) witnesses similarly testified that Officers Rademacher and Reece followed SPD's policies and training at all times during the subject events. *See* Hinson Dep. at 79:9-18.

The Defendants themselves have testified that what happened here *is* or *reflects* the policy, practice, and training of each of the departments. There is no daylight between them. Of course, Defendants deny that any violations occurred, but they do not deny that, if violations occurred, they reflect or were caused by the policy, practice, and training of the SPD and the Sevier County Sheriff's Office. There is thus ample evidence that the policies and training of the municipal defendants were the "moving force" behind the violations that occurred here. *Canton v. Harris*, 489 U.S. at 389.

Other evidence from which a jury could infer a policy or practice here: none of the officers was disciplined; to the contrary, some received commendations. All SPD officers received exceptional valor awards for their actions at the Wright home. None received any sort of discipline. Manning Dep. at 35:23-36:1. Additionally, Chief Manning, in reviewing information for his

deposition, had not seen any act or omission of any officer that concerned him or that believed warranted further investigation. *Id.* at 61:7-15. The limits of the investigation or review are further discussed in the statement of facts.

Based on the statements of the officers and other evidence, Plaintiffs' expert concluded that neither SPD or SCSO "adequately prepared personnel for joint operations" because "there was no coordinated training, shared tactical planning, or implementation of standardized protocols." Pleasants Decl. Ex. B at 12. Further, the officers "lacked scenario-based training, interoperable communication systems, and strict adherence to communication protocols." *Id.* "These systemic lapses created the conditions that led to the preventable death of David Wright." *Id.* Pleasants further concluded that "the facts and circumstances here show that SCSO and SPD have customs or practices of using deadly force that fall below generally accepted law enforcement standards and practices and that led to the death of David Wright." *Id.* Even though the written policies of both agencies "generally conform with national standards, the actual training, customs, and practices, as evidenced by the events in question and by the agencies' own characterization of those events falls significantly below those standards." *Id.* at 8.

Under all the circumstances here, a jury could reasonably find that "the conduct on the [Wrights' property] demonstrated the policy of the . . . city police force [and county sheriff's office] as approved by [their] policymaker[s], both before and after that time." *Grandstaff*, 767 F.2d at 171-72.

## VI. Plaintiff meets all the elements of her state law claims.

### A. The intentional torts at issue do not require the tortfeasor to intend to affect the eventual victim.

Ms. Wright is asserting state law claims against the individual defendants for assault, battery, and intentional or reckless infliction of emotional distress. In Tennessee, civil assault has two elements: "1. An intentional attempt or the unmistakable appearance of an intentional attempt to do harm to, or to frighten, another person; and 2. The present ability or the unmistakable appearance of the present ability to do that harm or to cause that fright." *Davis v. Covenant Presbyterian Church*, No. M2013-02273-COA-R3-CV, 2014 Tenn. App. LEXIS 361, at *18, n. 4 (Tenn. Ct. App. June 23, 2014) (citing T.P.I – Civil § 8.01). It is also proper to "refer to the statutory definition of a crime" in defining the elements of the assault. Under Tennessee's criminal statute, "a defendant need only act with the awareness that his conduct is reasonably certain to cause others to fear imminent bodily injury"; it is not necessary that the tortfeasor intend to cause a specific person to fear imminent bodily injury. *See State v. Woods*, No. E2001-01027-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 603, at *9 (Tenn. Ct. App. July 16, 2003). "A battery claim requires proof that the defendant intentionally committed an act that resulted in a harmful or offensive contact with the plaintiff." *Kelley v. Root*, No. W2022-01625-COA-R3-Cv, 2024 Tenn. App. LEXIS 37, at *11 (Tenn. Ct. App. Jan. 29, 2024). "Battery necessarily requires an unpermitted touching of the plaintiff by the defendant or by some object set in motion by the defendant." *Cary v. Arrowsmith*, 777 S.W.2d 8, 21 (Tenn. Ct. App. 1989). Intentional infliction of emotional distress has three elements; "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004).

**B.** **The Individual Defendants engaged in assault, battery and intentional infliction of emotional distress.**

The individual defendants, acting in concert, all surrounded the Wrights' home with the intent to frighten the people inside. This is evidenced by their language: Sgt. Tyner threatened to enter the Wrights' home forcibly if the front door wasn't opened. Near the same time, Officer Paul threatened to enter the Wrights' home forcibly if the back door wasn't opened.[18] They wanted the people inside to be afraid so that they would open the door. Because Defendants intended to frighten the people inside the home, and did, in fact, have the present ability to cause such fright, the officers' actions outside the home amounted to assault. Then, acting in concert, the officers began firing at the home and David and Vicki who were inside. Again, the officers were intending to harm Darryl Higdon because they were shooting at him, and this intent to harm or frighten another individual does not preclude a finding that the Defendants assaulted David and Vickie Wright by shooting at them in the house. *See* Shaffer Decl., Ex. 5 B, Report at 12. *See also* Ex. 9 (showing that there were a total of thirty-six bullet holes in the east side of the home). Battery occurred when Deputy Hunter shot at David Wright, killing David and hitting Vickie. Officer Hunter does not contend that he shot his gun on accident, and the bullets set in motion by his gun resulted in harmful contact with both individuals. *See* Video Ex. 19.

Finally, the result of the officer's joint action was that Vicki Wright endured various traumatic experiences: the police surrounding her house, the police shooting at her house and at her brother, and the Deputy Hunter shooting and killing Mr. Wright. The Defendants intended to surround her house, they intended to shoot in the direction of the house, and Deputy Hunter intended to shoot David Wright. At the very least, the officers were reckless in engaging in such

---

[18] Video Exs. E, 4, 5, 6, 12 and 13.

conduct because they were "aware of, but consciously [disregarded] a substantial and unjustifiable risk," resulting in a gross deviation from a standard of care that an ordinary person would exercise. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992) (superseded by statute on other grounds). The defendants' conduct was so outrageous that it cannot be tolerated by civil society: police officers, without a warrant, appeared at the Wright home, proceeded to shoot at individuals inside and outside the Wright home, and then shot an innocent bystander. As a result, Ms. Wright has suffered severe emotional distress. *See* Miller Decl. Ex. B at 5.

### C. Defendants are not entitled to qualified immunity on the state law claims.

For the same reasons discussed above, Plaintiffs are not entitled to qualified immunity for their actions outside the Wright's home, for their shots into the house, and for the shot that killed David and injured Vickie. The Individual Defendant's use of force was objectively unreasonable and went well beyond the force necessary in this situation. *See Harris v. Metro. Gov't of Nashville*, No. 3:06-0868, 2007 U.S. Dist. LEXIS 92895, at *32 (M.D. Tenn. Dec. 18, 2007) (finding that the defendants were not entitled to qualified immunity on plaintiff's state law assault and battery claims because it was well-established that excessive force could result in assault or battery where the plaintiff was a minor offering no credible signs of resistance).

### VII. Defendants rely on facts that are irrelevant, inadmissible, and plainly disputed.

### A. References to Higdon's "charges" are inadmissible.

Defendants' briefs improperly attempt to rely upon testimony about Higdon's prior "charges." Higdon was examined at some length about his prior "charges" and "arrests" during his deposition. Higdon Dep. p. 8:8 through 15:19. Mr. Higdon was not asked about convictions or judgments and did not recall many of the details about those issues.

Mr. Higdon testified that he did not serve any time (p. 9:16) for a charge in Asheville, N.C., and that a charge in Georgia "was just a charge" --"nothing happened" and he did not serve any time as a result of the charge (p.10:1-2, 21). As to other "charges" Mr. Higdon was asked about, he indicated when asked that he served some time, but the record does not indicate any particular offense of which Mr. Higdon was convicted or whether it was a felony and Mr. Higdon could not recall any details. *See id.* at 10:22 – 15:16 (Mr. Higdon did not recall the circumstances of some of the charges and was not asked and did not testify which of the charges led to the conviction of any specific offense). None is identified as a felony conviction or judgment.

The Federal Rules of Evidence prohibits the use of "other crimes, wrongs, or acts" from being admissible if used to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The defense may not use Mr. Higdon's criminal charges to prove that he "acted in accordance with the character.". Fed. R. Evid. 404(b)(1). "Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b).

Under Fed. R. Evid. 609: impeachment by evidence of a criminal *conviction*, for a criminal conviction to be admissible to attack a "witness's character for truthfulness by evidence of a criminal convictions, the evidence: (A) must be admitted, subject to Rule 403, in a civil case or criminal case in which the witness is not a defendant." Fed. R. Evid. 609(a)(1). As noted in *United States v. Simpson*, 337 F.3d 905 (7th Cir. 2003) ("The short answer to this argument is that Rule 609(a) applies only to prior *convictions*, and [defendant] was never convicted on the charges in [[question]]). As the Sixth Circuit has found, "a witness may not be impeached by evidence that he or she was indicted for a crime, since an indictment is not any evidence of guilt." *United States*

*v. Chance*, 306 F.3d 356 (6th Cir. 2002) (citing *Pearson v. United States*, 192 F.2d 681, 699 (6th Cir. 1951)). It has also found that "the prosecution may not comment on the fact that the defendant has been indicted on the crimes as being tried as proof of guilt." *Id.* (citing *United States v. Bowen*, 500 F.2d 41, 41 n.1 (6th Cir. 1974)).[19]

### B. Higdon's guilty plea for his conduct during these events is inadmissible.

"Neither [Fed. R. Evid.] Rule 801(d)(2) nor Rule 804(b)(3) supports admission of a guilty plea against persons other than the pleader in the usual situation. 2 Weinstein's Fed. Evid. § 410.07[4]. Thus, the effect that a guilty plea has on civil litigation where the person who entered a guilty plea is not a party to the litigation depends on a Fed. R. Evid. 403 analysis if the guilty plea is determined to fall under a hearsay exception under Fed. R. Evid. 803.

In *Green v. Taylor*, a similar cause of action arose when police officers, shooting at a car that Hoyle, a nonparty to the suit, was driving, hit a passenger, and killed the passenger; the mother of the victim, Green, filed suit against the police officers alleging two § 1983 claims, one for excessive for and one for pain and suffering from deprivation of life; a *Monell* claim against the city for failure to train and investigate; assault and battery; spoliation of evidence; IIED; and conspiracy. *Green v. Taylor*, 1:22-CV-0061, 2006 U.S. Dist. LEXIS 103827, 2006 WL 8448445, *29–30 (N.D. Ohio Apr. 11, 2006). Hoyle, the driver who the police were pursuing, took a plea deal which read "… the defendant is acknowledging that he set in course the events that led to the

---

[19] Even as to convictions, there are several factors that would have to be met – which have not been met here, for evidence of a prior conviction to be admitted: "'(1) The impeachment value of the prior crime. (2) The point in time of the conviction and the witness' subsequent history. (3) The similarity between the past crime and the charged crime. (4) The importance of the defendant's testimony. (5) The centrality of the credibility issue.'" *U.S. v. Moore*, 917 F.2d 215, 234 (6th Cir. 1990) (quoting *Gordon v. United States*, 383 F.2d 936, 127 U.S. App. D.C. 343 (D.C. Cir. 1967)).

death of his passenger." *Id.* at \*18. Hoyle was not a named defendant in Green's civil suit against the city and officers. The police defendants argued that there was no factual dispute because Hoyle's guilty plea conclusively established that Hoyle caused Mason's death and injured Taylor. The Court rejected their contention, finding that a non-party's guilty plea did not bind the Plaintiff in the civil action arising from the same events.

Another example of the application of these principles in a wrongful death case is *Rozier v. Ford Motor Co*. There, plaintiff brought a product liability action against Ford and argued that the trial court erred in admitting the plea of guilty of involuntary manslaughter of the driver who hit and killed her husband. 573 F.2d 1332 (5th Cir. 1978). Ford wanted to introduce the nonparty driver's guilty plea "as evidence that Mr. Rozier's death was caused by [nonparty driver's] criminal act not by Ford's negligence." *Id*. 1346. The Court found that even where the nonparty admitted to "caus[ing] the death of [Mr.] Rozier," the "*legal* cause of death, however, must be evaluated in the context of the social policies sought to be advanced by attaching liability to the consequence of specific actions by specific persons." *Id.* at 1347. In a later footnote, the court added that the evidence of the guilty plea "was not offered to prove a factual proposition at all, but rather to support a legal position – that the [nonparty driver's] guilty plea determined the issue of legal responsibility for the death of [Mr.] Rozier," and because of this, admitting the guilty plea as evidence would to confusion. *Id*. at 1348 n.16.

### C.     Virtually all of the TBI file materials are irrelevant and inadmissible.

Except to the extent the TBI investigation contains statements of parties or may be relevant to confirm what that investigation did not examine or disregarded, those reports are inadmissible hearsay. Accordingly, Plaintiff objects to their consideration pursuant to Fed. R. Evid. 401, 402, 403, 801, 802, and Fed. R. Civ. P. 56(c)(2).

The photographs taken of Daryl Higdon's room and other investigative information about Higdon referenced in the TBI report is information unknown to the officers at the time of the constitutional violations at issue in this case. That information is plainly inadmissible at trial and should not be considered for the purposes of Defendants' motions. As TBI case agent Dylan Reid acknowledged in his deposition, he found no evidence that any of the officers were aware of any of that information at the time the subject events occurred. Reid Dep. at 100:9-19. Further, as discussed previously, the officers involved in the Joint Operation knew little about Mr. Higdon when they surrounded the Wrights' home – some of them not even knowing what he looked like or what race he was. Whether Higdon was found after the fact to have drug paraphernalia, other weapons, ammunition, or Second Amendment posters in his room played no part of any of the officer's decision making that evening. Defendants do not claim otherwise. They have simply dumped the entire 1,454 page TBI file into the record in plain violation of L.R. 5.3 – a tacit acknowledgement of their concern about this case rising or falling on what the officers did and didn't do at the scene based on the information objectively available to them and how they cannot get around the unusual amount of video evidence of the underlying events themselves.

It's also notable that despite the length of the TBI's file materials, its investigation failed to include inspecting and documenting the thirty-six (36) bullets fired into the east side of the Wrights' home near where David and Vickie Wright were seeking shelter from the officers' and Higdon's gunfire; that Higdon was not in a position to be seen by the officers and had stopped shooting when officers fired those shots based on video evidence available to the TBI from the New Center School surveillance camera; or where the officers' bullets were fired. Also, as Agent Reid acknowledged, even as it was, the TBI investigation was intended to examine *criminal conduct* – not civil conduct. *See* Reid Dep. at 106:3-19.

**D.  Whether Vickie Wright should have been aware of Higdon's firearms and drug paraphernalia is not relevant.**

Just as the TBI photographs of Higdon's room after the incident are not relevant to what the officers involved in the Joint Operation violated David and Vickie Wright's Civil Rights based on information they weren't aware of, the issue of whether Vickie Wright should have known about the contents of Higdon's room is not relevant. Despite the Court's earlier ruling on the fireman's rule, Defendants strain to impute some kind of fault to Vickie. But "it is well-established that comparative negligence does not apply to damages for federal constitutional rights violations." *Nichols v. Knox Cnty., Tennessee*, No. 3:11-CV-417-PLR-HBG, 2016 WL 9149585, at *2 (E.D. Tenn. June 13, 2016) (citing *McHugh v. Olympia Entm't, Inc.*, 37 Fed. Appx. 730, 736 (6th Cir. 2002)).

As discussed above, Vickie did not know what Higdon had in his room. David told her a few months before the incident that he had seen Higdon with a gun on one occasion and immediately told him to get rid of it. Higdon assured David that he would and that he did. David believed he had handled the situation and that Higdon had gotten rid of the gun. Vickie did not go in his room out of respect for his privacy and on occasion when his door was open, she did not see any firearms, drugs, or alcohol. V. Wright Decl., Ex. __

Defendants' bare assertion in their brief that Higdon did not try to hide firearms and ammunition from David and Vickie Wright is misleading and distorts Higdon's testimony. hen ask whether it was something he tried to hide from them, he answered "no."  However, it's clear from the answer to the next question that what Higdon was saying was whether Higdon tried to hide it from David when he was confronted about it – not whether he ever tried to hide the firearms and ammunition he had. He was next ask: so, did they know that you had firearms and ammunition in the home even though it was against the rules? Answer: "no." *See* Higdon Dep. at 22:10–23:12.

71

When asked whether the TBI photographs showed what his bedroom typically looked like when he was living with Mr. and Mrs. Wright, he said "kind of, yeah." 37:4–8. When asked specifically whether he left guns, ammunition, or drugs out in the open in his room, he said no, and explained that he kept those items hidden because he knew that if David or Vickie saw any of them, he would be kicked out. 87:4-20. Defendants' implied argument that Vickie should have known what Higdon had in his room has no bearing on their motions, and Defendants' choice to refer to it in the briefing is troubling to say the least.

**<u>Conclusion</u>**

Video evidence of the subject events from multiple angles, as well as other material evidence in the record, clearly support, if not establish, Plaintiff's claims. As in *Grandstaff,* numerous officers – including the entire special operations team from the City of Sevierville, were acting in concert unlawfully with tragic consequences. The record is even stronger here because this was a Joint Operation involving two departments, including a ranking officer and a Field Training Officer from the Sevier County Sheriff's Office, and all of the Defendants—the individual officers as well as the City and County—have acknowledged during their deposition testimony that the actions and omissions were consistent with the departments' customs and practices and that the officers were following their training at all times. Those important principles are undisputed. Accordingly, based on the record before the Court, the conduct at issue is either unconstitutional or it's not. Particularly taken in the light most favorable to Mrs. Wright and given the United States Supreme Court's decision in *Barnes v. Felix*, 605 U.S. 73 (2025), the Defendants have failed to show legal grounds for dismissal at this stage. To the extent the unlawful conduct isn't established as a matter of law such that Mrs. Wright is entitled to a summary judgment pursuant to Fed. R. Civ. P. 56(f), at a minimum there are factual disputes that preclude a summary

judgment for any of the defendants. Accordingly, Defendants' respective motions for summary judgment, [Docs. 110, 112, 115, 117], should be denied in their entirety.

Respectfully submitted this 17th day of March, 2026.

<div style="margin-left:45%">

*s/Wayne A. Ritchie II*
Wayne A. Ritchie II    BPR No. 013936
James R. Stovall    BPR No. 032512
Ritchie, Johnson & Stovall, P.C.
606 W. Main Street, Suite 300
Knoxville, TN  37902
(865) 637-0661
war@rjs.law
jstovall@rjs.law
sellis@rjs.law
*Counsel for Vickie Wright, Individually and as next friend and wife of David Wright, Deceased*

</div>

73